# EXHIBIT 1 TO
# MOTION TO EXCLUDE EXPERT
# TESTIMONY OF LARRY GOANOS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

NBH CAPITAL FINANCE,

       Plaintiff,

  v.

SCOTTSDALE INDEMNITY
COMPANY,

       Defendant.

Civil Action No. 1:19-cv-02153

## EXPERT WITNESS REBUTTAL REPORT OF LARRY GOANOS

I, Larry Goanos, report as follows:

1.      I have been retained as an expert witness for the defendant in the lawsuit

styled as NBH Capital Finance v. Scottsdale Indemnity Company, Civil

Action No. 1:19-cv-02135, pending in the United States District Court for

the District of Colorado (the "Captioned Lawsuit"). This report rebuts the

expert witness report offered on behalf of the plaintiff by Jeffrey E. Thomas.

## QUALIFICATIONS

2.      A summary of my educational background, qualifications, publications, and

professional experience is contained in my *curriculum vitae,* which is

attached hereto as Exhibit 1 and incorporated herein by reference as though fully set forth at length.

3.      I began in the insurance industry in 1989 as an attorney practicing insurance law. I worked at law firms in New York City (D'Amato & Lynch) and Boston (Parker, Coulter, Daley & White) for five years, handling various insurance matters, with an emphasis on coverage issues relating to professional lines insurance claims. I represented clients such as AIG, Chubb, CNA, Continental, Aetna/ERMA, Zurich, CIGNA, RLI, Western World and various Lloyd's of London syndicates, among others.

4.      In 1994, I became the Chief Underwriting Officer of the Financial Institutions Group of AIG subsidiary National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). In that capacity, I was responsible for, among other things, drafting and editing primary and excess insurance policies, including Directors & Officers ("D&O") Liability Insurance policies and Errors & Omissions ("E&O") Insurance policies; drafting applications, endorsements, letters of intent and warranty letters; training underwriters on various aspects of insurance underwriting and claims; negotiating coverage and pricing with insurance brokers and

insureds; and working with National Union's Claims Department to help resolve complex claim issues.

5.     In 1996, I became an insurance broker with Marsh USA (as it was then called), one of the world's largest insurance brokerages, in its San Francisco, California office. In that capacity, as a licensed California insurance broker, I handled a wide variety of insurance placements. My duties included assessing client needs, soliciting quotes, negotiating terms and pricing with carriers, and structuring complex insurance programs. I worked on some of the largest accounts in the San Francisco office, including Bank of America, Wells Fargo, E*Trade, AmeriTrade, Chevron, Union Bank of California, and Stanford University. I was also a Claims Advocate at Marsh, in which capacity I worked with Marsh clients throughout the Western United States. In that role I explained the claims process, analyzed the merits of individual claims, and assisting in negotiating coverage with insurers.

6.     In 1998, I returned to AIG, where I became the Executive Vice President of National Union's Financial Institutions Group, performing many of the duties that I previously had handled for AIG, including drafting policy wordings and working with its Claims Department to resolve difficult claims. I also assumed greater responsibility for strengthening client and

broker relations and ensuring that the group met its financial goals.
Additionally, I represented National Union at speaking engagements on
various insurance topics throughout the United States.

7.     In 2002, I became a Senior Vice President of ACE USA's Professional Risk
Group. I supervised all management liability (D&O and related products)
underwriting for ACE USA, as well as professional liability (E&O)
underwriting for financial institutions. In this capacity, I was responsible for
overseeing day-to-day operations, including negotiating policy wordings;
drafting and editing primary and excess policies; drafting applications,
endorsements, letters of intent and warranty letters; training employees on
various aspects of insurance underwriting and claims; representing ACE
USA at speaking engagements throughout the country; and working with
ACE's Claims Department to help resolve complex claims.

8.     In 2005, I returned to Marsh at its New York City headquarters. I obtained
my New York State Property and Casualty Insurance Broker's License and
became a Managing Director, working with large clients nationwide on a
variety of insurance matters.

9.     In 2007, I became the President of Professional Indemnity Agency, Inc.
("PIA"), a wholly owned underwriting subsidiary of HCC Insurance

---

Holdings, Inc. (now known as Tokio Marine HCC). In this role, I oversaw the day-to-day operations of the entire subsidiary, including the Claims and Underwriting units. PIA underwrote a wide variety of insurance products.

10.    In 2008, I authored a book, "*Claims Made and Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance*," [New York: Soho Publishing, 2008; 376 pages]. I interviewed over 400 individuals about various aspects of the insurance industry while performing research for the book. To date, approximately 3,000 copies have been sold and the book has been translated into Japanese and published in Japan. *Claims Made and Reported* has received praise from many insurance executives, including Warren Buffett.

11.    In 2010, I founded Andros Risk Services, LLC, an independent insurance consulting firm. Among other services that I perform are: 1) Drafting policies for insurance carriers; 2) Providing training to insurance company Claims and Underwriting units, insurance brokerages, other insurance consultants, and law firms; 3) Acting as an outsourced insurance risk manager; 4) Conducting audits of insurance underwriting and claims operations; 5) Conducting benchmarking analyses to compare insurance programs for clients against their peers; 6) Critiquing and analyzing

insurance programs; 7) Acting as an insurance coverage arbitrator; and 7) Serving as a litigation consultant and expert witness in insurance disputes.

12. In my capacity as an independent consultant, I have served as an expert witness in more than 200 cases in state and federal courts nationwide and internationally. I have never been disqualified as an expert nor has my testimony ever been disallowed. I have also served as an arbitrator in an insurance coverage dispute.

13. In 2014, I authored a book titled "*D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach,*" [San Diego: Wells Media, 2014, 214 pages]. This book discusses technical coverage aspects of Directors and Officers Liability Insurance and was praised by many insurance industry executives, including, as with my first book, Warren Buffett. It is the best-selling book in its publisher's history.

14. I was the founding Dean of The School of Professional Lines Claims within the Claims College sponsored by The Claims and Litigation Management Alliance ("The CLM") from July of 2012 until September of 2015. The Claims College offers courses on best practices in claims handling for insurance professionals and attorneys. I designed Claims courses with my executive committee which was comprised of senior claims executives from

major carriers. I also taught, and still teach, classes to a student body consisting of Claims professionals from a wide array of carriers, as well as in-house and outside counsel. The CLM, arguably the insurance industry's leading claims-focused organization, has a membership of more than 40,000 individuals, 2,000 law firms and 800 insurance companies.

15. I was the president and chief underwriting officer of APRI Group, Inc. from May 2015 until November 2016. APRI Group, Inc. was an independent managing general underwriter (MGU) that acted as an outsourced underwriting arm of insurance carriers.

16. In summary, I have over 30 years of insurance industry experience as: 1) An outside attorney representing a variety of carriers in claims matters; 2) An insurance company senior manager overseeing claims and underwriting units; 3) An insurance broker (formerly licensed in all 50 states) representing client companies of all sizes; 4) The president of two companies underwriting insurance on behalf of insurers; 5) Dean of a school dedicated to teaching best practices in claims handling; and 6) An independent insurance consultant providing services to insurance carriers, insurance brokerages and other clients.

## STATEMENT OF COMPENSATION

17.   I am being compensated at a rate of $800 per hour and my compensation is not contingent in any way on the outcome of this matter.

## PUBLICATIONS AND PRIOR TESTIMONY

18.   A listing of insurance publications that I have authored during the previous 10 years, as well as a listing of my testimony as an expert witness in the last 4 years, is attached as Exhibit 2 of this report.

## MATERIALS REVIEWED

19.   I have reviewed the materials listed in the attached Exhibit 3 of this report.

## FACTUAL BACKGROUND

20.   VIA International, Inc. ("VIA") was formed on August 27, 2013. The company was a roll-up of six home electronics contractors (the "Western Six") in the western United States. A seventh company was later added to the group.

21.   Timothy A. Lucas ("Lucas") and J.T. Sussman ("Sussman") were outside consultants to the Western Six prior to the creation of VIA. Subsequently, on the date of VIA's inception, Lucas became the company's Chief Financial

Officer. In October of 2013, Sussman became the company's Chief Accounting Officer and Controller.

22.   Lucas and Sussman were responsible for, among other things, VIA's accounting functions and the preparation and maintenance of VIA's financial statements and records.

23.   On the date of VIA's formation, August 27, 2013, NBH Capital Finance ("NBH") created a credit facility for the benefit of VIA. Through this credit facility, governed by a loan and security agreement (the "Loan Agreement"), NBH loaned millions of dollars to VIA. The credit facility was comprised of three loans: 1.) a $5 million fixed term loan; 2.) a $4 million revolving line of credit; and 3.) a $600,000 fixed term loan.

24.   The loans were secured by VIA's assets, primarily inventory and accounts receivable.

25.   VIA and a variety of related corporate entities were designated as "Borrowers" under the Loan Agreement and NBH was the designated as the "Lender."  Neither Lucas nor Sussman were individually designated as Borrowers by the Loan Agreement. After VIA's accounting difficulties came to light, NBH obtained personal guarantees of the Loan Agreement

from individual founding members ("FMs") of VIA. Neither Lucas nor Sussman were in this group of loan guarantors.

26. Scottsdale Indemnity Company ("Scottsdale") issued its Business and Management Indemnity Policy No. EK113166204 to VIA for the policy period of August 27, 2015 to August 27, 2016 (the "Policy.") The Policy carries a $3 million maximum aggregate limit of liability under its Directors and Officers and Company Coverage Section. The **Continuity Date**[1] is October 14, 2014, except as per the Policy's endorsement no. 43, the **Continuity Date** with respect to coverage extended to Via International & Receivership by the endorsement is October 15, 2015.

27. The Policy was written on a "claims made and reported" basis, which, as it states in bold-faced capital letters in the Policy's heading, applies to:

"…**ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED REPORTING PERIOD AND REPORTED TO THE INSURER PURSUTANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION**."

---

[1] All bold-faced words herein are used in accordance with the definition ascribed to them in the Policy.

28.   On April 23, 2014, NBH sent a letter to VIA informing VIA that it was in default of a provision of the Loan Agreement. NBH demanded a fully-earned, non-refundable payment of $2,500.00 in order for NBH to forgo exercising its rights in the event of a default as set forth in the Loan Agreement.

29.   On August 14, 2014, NBH sent another letter to VIA, this time informing VIA that it had been in default of the Loan Agreement since "at least February 28, 2014." This letter also stated that VIA was in default of three sections/covenants of the Loan Agreement. NBH demanded a fully-earned, non-refundable payment of $2,500.00 in exchange for NBH to forgo exercising its rights in the event of a default as set forth in the Loan Agreement.

30.   VIA was subsequently declared to be in default of the Loan Agreement by NBH in October of 2015.

31.   NBH filed a lawsuit against Lucas and Sussman on September 1, 2016 in Denver District Court alleging that Lucas and Sussman had provided false financial information to NBH in connection with the administration of the loans that NBH had extended to VIA. On October 25, 2016, Lucas and

Sussman had the case removed to the United States District Court for the District of Colorado (the "NBH Lawsuit.")

32.   Lucas and Sussman tendered the NBH Lawsuit to Scottsdale as a purported **Claim**, as defined in the Policy, by an email from VIA's insurance broker, Alliant Americas, on October 10, 2016.

33.   By letter dated November 15, 2016, Scottsdale agreed to fund a defense for Lucas and Sussman pursuant to a reservation of rights.

34.   On May 2, 2017, after further review and analysis, Scottsdale denied coverage for the NBH Lawsuit and informed Lucas and Sussman that it would stop funding their defense costs.

35.   In November 2017, Lucas and Sussman entered into a settlement agreement with NBH (the "Settlement Agreement") which provided that the parties would arbitrate their dispute in Denver before the Judicial Arbiter Group (the "Arbitration.")

36.   Pursuant to the Settlement Agreement, Lucas and Sussman assigned to NBH any right, title and interest that they had against Scottsdale under the Policy for indemnification of any judgment and award that might be obtained by NBH should it prevail in the Arbitration.  However, Lucas and Sussman

reserved any right they had against Scottsdale under the Policy for coverage of defense expenses.

37.   On April 18, 2019, the Arbitration resulted in a $4,304,922.85 award in favor of NBH and against Lucas and Sussman, jointly and severally. The United States District Court for the District of Colorado confirmed the Arbitration Award on May 6, 2019.

38.   NBH subsequently filed the Captioned Lawsuit against Scottsdale in its capacity as a judgment creditor and assignee of Lucas and Sussman seeking payment of the $4,304,922.85 Arbitration award from Scottsdale under the Policy. NBH also contends that it is an Insured under the Policy (as that term is defined therein) pursuant to an assignment of Policy benefits by Lucas and Sussman in favor of NBH.

## OPINIONS AND ANALYSIS

### Opinion No. 1:  Scottsdale's Conclusion That The Claim Was Not First Made And Reported During the Policy Period Was Reasonable

39.   Directors and Officers Liability Insurance ("D&O Insurance"), like most insurance products, operates under the premise of fortuity. It is intended to provide protection against perils which are fortuitous and random, i.e. not those that are certain to occur.

40.     Almost all D&O Insurance policies (including the Policy) are written on a claims made and reported basis. That is, a claim must be first made during the policy period and reported to the carrier within a prescribed time frame.

41.     If a claim was originally been made prior to a policy's inception and then is resurrected in some form after the policy becomes effective, it is insurance industry custom and practice to exclude such claim from coverage under the in-force policy because it is not a new claim and does not represent a fortuitous event. If carriers were to provide coverage for previously-existing claims under a D&O Insurance policy, loss ratios would skyrocket and most likely the product would become extinct.

42.     In order to establish a boundary for potential coverage of claims arising from wrongful acts, most D&O Insurance policies contain what is called a "continuity date." The continuity date is normally referenced as part of an exclusion in order to clarify what prior claims would be excluded.

43.     According to the Policy's DEFINITIONS Section, **Claim** is defined, in part, to mean "…a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief."

44.  **Wrongful Act** is defined in the Policy as "…any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a.  any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against and **Director and Officer** solely by reason of his or her serving in such capacity;

    b.  any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    c.  the **Company**, but only with respect to Insuring Clause 3 of this Coverage Section.

45.  The Policy's Exclusion 1.k. states that:

    **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i.  any prior or pending litigation or administrative or regulatory proceeding, *demand letter* or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

        ii.  any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, or administrative or regulatory proceeding, *demand letter* or formal or informal governmental investigation or inquiry; (emphasis added)

---

46.    In this matter, VIA's default on its obligations under the Loan Agreement began at least as early as April 23, 2014, well before the Policy's October 18, 2014 **Continuity Date**.

47.    VIA, an **Insured** under the Policy, received a letter on April 23, 2014 from NBH's executive vice president, Christopher S. Randall, stating that VIA and related entities ("Borrowers") were in default of Section 6.11(c) of the Loan Agreement. The letter goes on to say that "The Existing Default constitutes an Event of Default under the Loan Agreement. Subject to receipt of a fully earned, non-refundable default fee equal to $2,500, Lender will not presently exercise its rights and remedies available upon an Event of Default, but Lender reserves its right to do so at any time in its sole discretion."

48.    This notice of default and demand of $2,500 clearly constitutes a "demand letter" against an **Insured**. Mr. Thomas's report attempts to dismiss this notice (and additional default notices to VIA dated August 14, 2014 and April 23, 2015 – all prior to the **Continuity Date**) as simply constituting "…technical violations of the loan agreement, not for failure to make required payments." (Thomas Report on page 20)

49.    Mr. Thomas's distinction without a difference ignores the fact that for insurance coverage purposes – and as clearly set forth in the Policy – a breach of the Loan Agreement is the salient fact, the cause of the breach is not relevant. The plain fact is that NBH made a demand seeking compensation for an alleged **Wrongful Act** prior to the **Continuity Date** which is inextricably tied to the NBH Lawsuit that eventually ensued. Breaching the Loan Agreement is the **Wrongful Act**.

50.    There is an old saying in the insurance world: "You can't insure a burning building." Also sometimes stated as, "You can't buy fire insurance after you smell smoke."

51.    In this case, the building was already burning, VIA had breached covenants of the Loan Agreement based on financial ratios. Those financial shortfalls continued to mount until, ultimately, VIA could not make its required payments and defaulted on the Loan Agreement. These events are *inextricably intertwined*, and were rightly treated as such by Scottsdale in my opinion, especially in light of the broad language of the Policy's exclusion 1.k.

52.    As someone who has overseen the underwriting of D&O Insurance for thousands of companies, it is my opinion that the NBH Lawsuit did not

materialize out of thin air, but rather it was an organic outgrowth of VIA's prior defaults which occurred before the **Continuity Date.** The NBH Lawsuit, in my opinion, falls well within the type of event which is meant to be excluded by the Policy as a **Claims** that was not first made during the policy period.

### Opinion No. 2: Scottsdale's Conclusion That The Prior And Interrelated Wrongful Acts Exclusion Squarely Applies To The NBH Lawsuit Was Reasonable

53.   D&O Insurance is underwritten and "rated up" (an industry term for calculating premium charges) according to a wide variety of factors.

54.   One of the most significant underwriting factors is the time frame that determines how far back in time a carrier is willing to provide coverage for acts that may lead to future claims.

55.   As a general rule of thumb, D&O Insurance carriers will only provide coverage for claims arising from the acts of a "*de novo*," or start-up company, commencing with the date that the company first came into legal existence.

56.   The logic behind this thinking is that most companies do not have all of their policies and procedures fully in place before they officially commence operations and the carrier does not want to assume the risk of claims which

may arise from acts, errors and omissions committed during these unsettled times.

57.     In addition, since the new company was not paying a D&O Insurance premium during its pre-formation days, many carriers feel that it unwise and unfair to give a policyholder a "free ride" for acts committed during this time.

58.     Thus, it is standard in the insurance industry to have a "prior acts" exclusion in a D&O Insurance policy that excludes coverage for claims arising from acts, errors and omissions occurring before the company's official launch date.

59.     The Policy, in keeping with insurance industry custom and practice, contains Endorsement No. 32, which adds language to Exclusion C.1. by stating:

> **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:
>
> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:
>
> 1. any **Wrongful Act** actually or allegedly committed prior to 8/27/2013; or
>
> 2. any **Wrongful Act** occurring on our subsequent to 8/27/2013 which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**

60. The term **Interrelated Wrongful Acts** is defined in Section B.6. of the Policy to mean: "…all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes."

61. **Claim** is defined in the Policy's Section B.1., in part, to mean "…a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief."

62. The NBH Lawsuit, in paragraph 48 of the Complaint, states that "Defendants Lucas and Sussman became aware during the period between June and November 2013 that VIA subsidiaries were not maintaining accurate periods of inventory and accounts receivables."

63. Paragraph 49 the Complaint goes on to say that "Defendants Lucas and Sussman failed to implement proper procedures to report inventories and accounts receivables which resulted in a vast overstatement of collateral base upon which NBH based the VIA loans."

64. June and July 2013 (and most of August) obviously pre-date the official formation of VIA and the inception of the Policy on August 27, 2013. Thus, any **Claim**, including the NBH Lawsuit, arising from acts prior to August

27, 2013 is excluded from coverage under the Policy. And any additional **Wrongful Acts** related to the alleged inadequate accounting procedures occurring after August 27, 2013 would constitute **Interrelated Wrongful Acts** and, thus, any **Claim** based on those allegations would similarly be excluded under the Policy.

65.    In short, the NBH Lawsuit is based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving alleged **Wrongful Acts** that began before VIA had purchased the Policy and before a time when Scottsdale had agreed to provide coverage for **Claims** arising from alleged **Wrongful Acts**. Thus, it is excluded from coverage under the Policy according to insurance industry custom and practice.

### Opinion No. 3: Scottsdale's Conclusion That The Prior Knowledge Exclusion Applies To The NBH Lawsuit Was Reasonable

66.    D&O Insurance is based on the precept of fortuity; it is meant to provide protection against perils which are unforeseen and not certain, or not even likely, to occur. If an **Insured** suspects that a **Claim** is reasonably likely to arise from a situation at any point before a policy's **Continuity Date**, it is

fair and just, in my opinion and in accord with insurance industry custom and practice, for such **Claim** to be excluded from coverage.

67. The **Continuity Date** of the Policy is October 14, 2014, except as per the Policy's endorsement no. 43, the **Continuity Date** with respect to coverage extended to Via International & Receivership by the endorsement is October 15, 2015.

68. Exclusion 1.l. of the Policy addresses this issue. It withholds coverage for any **Claim:**

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

69. This is a fairly standard exclusion present in the majority of D&O Insurance policies underwritten in the past 30 years or more, although exact wording may vary from carrier to carrier.

70. Mr. Thomas, in my opinion, significantly misstates the purpose of the prior knowledge exclusion in his report. On page 14 of his report, Mr. Thomas writes that "…the purpose of the Prior Knowledge Exclusion is to allocate claims to the proper policy year."

71.     This is incorrect. The purpose of the Prior Knowledge Exclusion is to exclude **Claims** under the current policy for matters that the **Insureds** reasonably foresaw would lead to a **Claim**. The vast majority of such matters, in my experience, receive *no coverage* since it would be too late to report said knowledge under an expired policy. The Prior Knowledge Exclusion does not "allocate claims to the proper policy year" as Mr. Thomas contends.

72.     In this matter, Messrs. Lucas and Sussman, presumably competent and experienced financial professionals, were both aware that VIA had been in default of the Loan Agreement repeatedly prior to the **Continuity Date** from, among other things, default notices sent to VIA on August 14, 2014 and April 23, 2014.

73.     When a company has difficulty adhering to financial ratio requirements imposed by a lender, it doesn't take a savvy financial professional to understand that such defaults may reasonably be expected to give rise to a **Claim**, especially when the aggrieved lender explicitly states that it is foregoing a potentially draconian remedy.

74.     In fact, Mr. Lucas, during his deposition in this matter was asked: "If you missed loan covenants did that raise a concern at the bank that a borrow in

this case, VIA might default on the loan?" His answer: "It's certainly a red flag." (Lucas deposition at page 118)

75.     As Exclusion 1.l. of the Policy states, it applies to withhold coverage if "…any **Insured** had knowledge…" prior to the **Continuity Date** of any "…**Wrongful Act**, fact, circumstance or situation…" and that "…such known **Wrongful Act** could reasonably be expected to give rise to such **Claim."**

76.     In my opinion, and based upon my 30-plus years of experience in the insurance industry, an **Insured** admitting that something is a "red flag" indicates that he or she can reasonably foresee a **Claim** arising from that situation.

77.     In addition, in an April 19, 2013 email to Sussman, Lucas wrote that they "need to pay attention to reported balances for inventory and AR [accounts receivable]. My gut is that they are all a little heavy." While Mr. Thomas dismisses this statement cavalierly in his report, "a little heavy" is a euphemism for "inaccurate" or "misleading." Mr. Lucas is admitting in writing to Mr. Sussman that he knows that the financials are erroneous. This, again, is knowledge of a situation that "could reasonably be expected to give rise to such **Claim**" as stated in Exclusion 1.l.

78.   Mr. Thomas, in his report, concedes that "…*there is evidence from which one could argue that there was knowledge of purported wrongful acts prior to the continuity date*," (underlining added) but then he goes on to write, "Scottsdale did not identify or rely upon reasonable evidence to support its conclusion that the insureds had reason to believe that the wrongful acts could be expected to give rise to the claim." I strongly disagree.

79.   In the May 2, 2017 letter to Mr. Lucas and Mr. Sussman and a May 22, 2017 letter from Scottsdale's counsel to Gardere Wynne Sewell, LLP, Scottsdale's counsel identified specific grounds for Scottsdale's position on prior knowledge, including citing Mr. Lucas's April 19, 2013 email to Mr. Sussman wherein Mr. Lucas noted that the reported balances to inventory and accounts receivable were "…all a little heavy." Again, in this context the words "a little heavy" are a euphemism for "inaccurate" or "erroneous."

80.   Scottsdale's counsel's letter also cited an October 9, 2013 email written by Rick Montemayor, a founding member of VIA, to Mr. Lucas "…which expressed concerns regarding bank covenants, an upcoming audit, and the integrity of financial data (including financial statements & forecasts)." Scottdale's counsel's letter goes on to note that "Mr. Montemayor also discussed a 'backlog report' which apparently depicted an item (equating to

roughly 20% of the total backlog amount) that had not been viable for two

months, but which the report's drafter was told to leave on the report."

81.    For Mr. Thomas to assert that the above-cited grounds substantiating prior

knowledge were insufficient, to me, flies in the face of credulity.

### Opinion No. 4: Scottsdale's Conclusion That The Warranty Exclusion Bars Coverage For The NBH Lawsuit Was Reasonable

82.    Endorsement No. 19 of the Policy, which amends the Policy's Warranty

Provision, states, in relevant part, that:

> In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:
>
> a. any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials or this **Policy**;

83. Mr. Lucas, as previously noted, was clearly aware of the inaccurate financials which were "a little heavy" and were provided to Scottsdale as part of the **Application** in connection with the underwriting of the Policy.

84. Mr. Thomas attempts to summarily dismiss the applicability of this exclusionary language in his report. On page 21, he states that "This exclusion was not a reasonable basis for Scottsdale's denial of coverage."

85. The irony of Mr. Thomas's dismissal of the Warranty Exclusion is that the inaccurate financials that were provided to Scottsdale as part of the underwriting process are the same inaccurate financials that NBH alleges caused it to make loans that VIA defaulted upon. In essence, Mr. Thomas is saying, "The inaccurate financials that NBH is complaining of, and which caused NBH harm, should be accepted by Scottsdale with no objection."

86. Again, calling upon my experience as someone who has overseen the underwriting of thousands of D&O Insurance policies, I can unequivocally say that financial statements are material to the acceptance of a D&O Insurance risk – indeed, they are probably the primary concern of most carriers – and their falsity, if known, would unquestionably affect the underwriting process. In my opinion, if a carrier knowingly received false financials as part of the application process, it would result in the carrier

declining to quote the account. However, Scottsdale was deprived of that opportunity in this matter since, like NBH, it was unaware that the financials were inaccurate.

### Opinion No. 5: Scottsdale's Position That The Policy Prohibits Messrs. Lucas And Sussman's Assignments To NBH Is Reasonable

87.    Virtually every D&O Insurance policy that I have encountered in my career is non-assignable without permission; that is, the **Insureds** are not permitted to assign their interests under the policy without the issuing carrier's written permission. The Policy is no different.

88.    Section M. of the Policy's General Terms and Conditions, titled "**ACTION AGAINST THE INSURER, ALTERATION AND ASSIGNMENT**," states in its last sentence: "No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**."

89.    Under the terms of the award resulting from the Arbitration, Lucas and Sussman purportedly assigned their rights under the Policy to NBH in order to allow NBH to pursue Scottsdale directly for insurance coverage.

90.   It is my understanding that Scottsdale never provided authorization, written or otherwise, for Lucas and Sussman to assign their rights under the Policy to NBH. Thus, it is my belief that the Captioned Lawsuit should be dismissed for this reason in addition to others set forth in this report.

91.   I should point out that NBH seems to be familiar with the concept of providing authorization before contractual rights can be assigned since its default letters to VIA dated April 23, 2014 and August 14, 2014 reference VIA and its affiliated companies and, after grouping them together as "Borrowers," goes on to say "…and each, together with its successors and permitted assigns…" (underlining added). To me, this is NBH acknowledging that an assignment is valid only when permitted by the relevant party.

**Opinion No. 6: The NBH Lawsuit Is Not The Type of Claim To Which A D&O Insurance Policy Is Intended To Respond**

92.   In my 30-plus years of involvement with D&O Insurance as coverage counsel working as an underwriting manager, insurance broker, president of two managing general agencies and an independent consultant, I don't believe that I have ever seen a D&O policy provide an indemnity payment for a claim solely against individual directors and officers in a situation

involving a corporation's default under a loan contract. It is simply not a peril against which D&O Insurance is intended to protect. Part of this is attributable, in my opinion, to the fact that individuals are normally not liable for the debts of the corporation.

93. Mr. Thomas, on page 6 of his report, attacks Scottsdale's claims handler in this matter because he "…characterized NBH's demand as a 'ploy' to see if they could get the claim to 'register' with the insurance carrier."

94. As someone who has been involved with D&O claims for the entirety of my insurance career, and has been the dean of a claims college teaching best practices in professional lines insurance claims handling, I agree with the Scottsdale claims handler's assessment of the NBH Lawsuit.

95. The process of properly underwriting loans before extending credit is a core competency of any lending institution. In the world of professional lines insurance, this is generally considered an uninsurable risk, or, as we often say in the insurance industry, it is "the cost of doing business."  In this matter, it seems to me that NBH, having failed in its underwriting of VIA's loan by, among other things, not properly confirming inventory counts, is simply trying to improperly pass along its liability for its own errors to Scottsdale.

96.   NBH's counsel, Markus Williams Young & Zimmermann LLC, admitted in an April 14, 2017 letter to Winget, Spadafora & Schwartzberg, LLC, on page 4, that: "Two potential lending sources (Bank of America and Republic Bank) noted on the reporting problems with receivables and inventory accounting during their negotiations for a loan to VIA…Neither Bank of America nor Republic was willing to provide financing at that level because of their concerns with the collateral base." A more damning admission on behalf of NBH in this matter would be hard to imagine.

97.   Essentially, NBH's counsel is admitting that two other banks were able to discern problems with VIA's financials that escaped NBH's attention. NBH would now like Scottsdale to serve as a surety for the loans taken out by VIA by providing indemnification under a D&O Insurance policy for a matter that, in my opinion, is rightfully NBH's burden to bear.

98.   I have overseen the underwriting of D&O Insurance and other professional lines of insurance for financial institutions at insurance carriers AIG/National Union, ACE (now Chubb) and Houston Casualty (now Tokio Marine HCC).

99.   I can state with confidence that loss attributable to loan defaults is considered an uninsurable risk under traditional insurance products in the professional lines insurance world.

100.   An example of this can be seen, in among other places, in a Bankers Professional Liability Insurance Policy underwritten in Colorado by Great American Insurance Company through a program sponsored by The American Bankers Association.

101.   This policy, form no. PD 1130 (10 18), contains a standard exclusion in the "guts" of the policy which states:

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving, or relating to an extension of credit, an agreement or refusal to extend credit, **Loan Servicing**, or the collection, restructuring, repossession or foreclosure of any extension of credit.

102.   Virtually every other standard Bankers Professional Liability policy in the insurance market contains a similar exclusion and has for many years.

103.   Making lenders whole for inadequate loan underwriting procedures and decisions in connection therewith is simply not within the contemplation of D&O Insurance policies or, for that matter, any other standard professional lines insurance policy. If the situation were otherwise, each D&O Policy would serve as a surety bond for every loan made to every corporate D&O

insured in America, something that would quickly result in the extinction of D&O Insurance.

104.   The Policy contains Exclusion C.2.a. which withholds coverage from any **Claim** "…alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement, except and to the extent the **Company** would have been liable in the absence of such contract or agreement…"

105.   This exclusion would ordinarily serve to preclude coverage from a matter such as the NBH Lawsuit however, in my opinion, NBH is attempting to circumvent the normal operation of D&O Insurance by not naming the entity as a defendant in a matter centering on defaulted loans and instead trying to foist off liability on individual officers who did not personally assume liability for said defaulted loans. This is the "ploy" to which Scottsdale's claims professional, rightfully in my opinion, alluded as cited in Mr. Thomas's report.

### Opinion No. 7: Scottsdale Acted Reasonably In Connection With The Arbitration Decision and Judgment

106.   As a matter of insurance industry custom and practice, an insurer that has denied coverage will not reevaluate its decision absent a specific request

from its insured and the provision of additional information warranting such reconsideration. Accordingly, Mr. Thomas' statement that Scottsdale was required to reevaluate coverage based upon the arbitration decision, without a submission of that decision, is erroneous.

107.   Mr. Lucas acknowledged in his deposition that after Scottsdale denied coverage to Messrs. Lucas and Sussman, they chose not to question or otherwise challenge the denial, thus accepting the result. The coverage correspondence available also indicates that Messrs. Lucas and Susman did not respond to Scottsdale after they received the denial of coverage. Even after the arbitration decision was entered, neither Mr. Lucas nor Mr. Sussman provided the decision to Scottsdale or asked Scottsdale to evaluate it for coverage. This is confirmed in Scottsdale's coverage notes.

108.   Scottsdale acted consistently with insurance industry custom and practice, when it did not reevaluate coverage after May 2, 2017. There were no further requests for coverage or additional materials submitted for Scottsdale's consideration after the May 2, 2017 denial. Mr. Thomas does not support his statement that Scottsdale should have reevaluated coverage with any citations to record facts or evidence.

109.  In addition, the arbitration decision did not undermine Scottsdale's key coverage determinations, with which I agree. The arbitration decision, which was largely written by NBH according to its own testimony, adjudicated the particular issues that were actually presented and contested in the arbitration. Notably, there is no evidence that the arbitrator was presented with any issues concerning the interpretation or the application of any of the provisions in the Policy. Accordingly, the arbitrator did not have any occasion to consider, and it was not presented with evidence about (i) the date when the **Claim** was first made, (ii) if there was a prior pending **Claim** before the **Continuity Date**, (iii) if there were any **Interrelated Wrongful Acts** that were in any way related to the **Wrongful Act** submitted to arbitration, (iv) whether Messrs. Lucas and Sussman had reason to believe a claim could be made concerning the NBH loans or VIA's inaccurate accounting, before the **Continuity Date**, or (v) whether there were misrepresentations made in the **Application**.

110.  Indeed, none of the key exclusions depend on the final adjudication of the **Claim**. The wording of the Prior Pending Claim Exclusion (k), the Prior Knowledge Exclusion (l), and the Prior and Interrelated Wrongful Acts Exclusion (Endorsement No. 31) makes them applicable whenever there is a

Claim "*alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving*" the circumstances of each exclusion. Thus, the allegations of a **Claim** or any extrinsic circumstances from which the **Claim** arises, or to which it is attributable, may trigger these exclusions. Moreover, the Warranty Exclusion (Endorsement 19) applies to misrepresentations made in the **Application**, and the **Application** is not at issue in the merits adjudication of a **Claim**.

111.   Mr. Thomas cites a statement from the arbitration decision that no claims were asserted against Mr. Lucas and Mr. Sussman for their work as independent contractors before the formation of VIA on August 27, 2013. Thomas also cites the decision's statement that Mr. Lucas did not determine until November 2014 that NetSuite and the accounting methodology he adopted were not working appropriately. In my view, these statements are obviously self-serving, likely written by NBH, and do not appear to involve necessary determinations for the adjudication of NBH's single count of negligent misrepresentation.

112.   Importantly, these statements are contradicted by the arbitrator's key determination that VIA was deceived, and incurred damages, as a result of

misrepresentations made in connection with the Promissory Term Note for a fixed-term loan made as of August 27, 2013. The proceeds of that Term Note were immediately disbursed. Either NBH was damaged in the amount of the Term Note due to misrepresentations at the time it was extended, or NBH extended the loan without being damaged by misrepresentations and it could not recover. The arbitrator's finding that NBH was damaged due to misrepresentations made in connection with the Term Note, as of August 27, 2013, contradicts Mr. Thomas' conclusions.

113.    Based on my years of experience in the insurance industry and knowledge of industry custom and practice, NBH's recovery for misrepresentation damages incurred on August 27, 2013 supports application of the Prior and Interrelated Wrongful Acts Exclusion, the Prior Knowledge Exclusion, and the Warranty Exclusion.

114.    Mr. Thomas's analysis is also incorrect because the Prior Knowledge Exclusion has an objective component. A prior knowledge exclusion is understood and intended to protect insurers from the risk than an insured, who has caused deception (intentional or negligent) to the insurer and third-parties, might be rewarded with coverage. Without such an exclusion, parties would be incentivized to deceive third parties, while benefitting from

coverage obtained through deceptions made to the insurer. Thus, an important question that Scottsdale could reasonably consider was when a reasonable officer, in the same circumstances as Messrs. Lucas and Sussman, could reasonably expect a claim.

### Opinion No. 8: Scottsdale Exceeded Insurance Industry Custom and Practice For Good Faith Claims Handling Practices

115.   Unlike Mr. Thomas, I will not profess to tell the Court what legal standards of bad faith claims handling would apply to Scottsdale's handling of the NBH Lawsuit. Determining applicable law is not my role. Rather, I opine upon insurance industry custom and practice with respect to good faith claims handling as someone who has overseen a claims department and has worked for, and with, insurance carriers and brokers for over thirty years.

116.   In my opinion, Scottsdale adhered to and exceeded insurance industry custom, practice, and standards for good faith claims handling practices.

117.   First, As Mr. Thomas concedes in his report on page 4: "…Scottsdale acted reasonably and consistently with insurance industry custom and practice when it provided a defense to NBH's claim under a reservation of rights…" I wholeheartedly agree with this conclusion.

118.   Second, Scottsdale, in my opinion, evaluated the coverage issues in a timely and reasonable manner that was fair to the **Insureds** and fully consistent

with, or even exceeded, insurance industry custom and practice. The company conducted a detailed analysis into the NBH Lawsuit with respect to coverage under the Policy, as information was presented to Scottsdale.

119. Throughout Scottsdale's handling of the claim, Scottsdale maintained up-to-date and informative notes of the claim review process and status. Upon initial receipt of NBH's December 30, 2015 demand, Scottsdale's claim notes and the deposition testimony reflect that Scottsdale reacted immediately by communicating with VIA and assigning defense counsel. Likewise, upon receipt of a copy of the complaint filed in the NBH Lawsuit, Scottsdale's claim notes and the deposition testimony reflect that Scottsdale acted immediately to review the complaint, gather information, and assign defense counsel to the **Insureds**. Scottsdale also issued timely and informative coverage letters throughout the handling of the claim, including on February 26, 2016, June 17, 2016, September 8, 2016, November 15, 2016, May 2, 2017 and May 22, 2017, in addition to various emails that were exchanged among representatives of Scottsdale and the **Insureds**.

120. Third, the assignment of claim monitoring and coverage evaluation duties to one "point" person, Aaron Klass, at Scottsdale was appropriate and

consistent with industry custom and practices for the good faith handling of claim procedures.

121.   I disagree with Mr. Thomas that there is an industry custom and practice requiring all insurers who provide a defense under a reservation of rights to assign different personnel for monitoring of a claim and for evaluation of coverage issues. Appointed defense counsel owe their duty of loyalty to an insured, and such counsel are not required to follow the input or suggestions of claim professionals concerning the defense of a matter. However, a claim professional may provide such input, since even after an insurer's reservation of rights to deny coverage, an insurer and the insureds share a common interest to avoid an adverse judgment on the claim.

122.   The testimony in this case is that Scottsdale appointed external, independent attorneys to defend the Insureds. Scottsdale's own claims professionals did not undertake the defense of the claim. When external, independent defense counsel is appointed, the same claim professional is capable of monitoring a claim, providing input to minimize exposure of the **Insureds** and Scottsdale, subject to the judgment of independent defense counsel, and to apply the terms of the Policy in a reasonable manner.

123. Further, Mr. Klass had access to, and received guidance and recommendations from multiple other professionals within and outside Scottsdale. Within Scottsdale, Mr. Klass drew upon in-house expertise of a technical coverage group and his manager.  At its own expense, Scottsdale also retained outside counsel to assist it in reviewing and analyzing the matter. Said counsel engaged in a detailed discourse with counsel for NBH, discussing various aspects of the NBH Lawsuit and how it related to specific provisions of the Policy. Therefore, the resources and personnel assigned by Scottsdale to monitor and evaluate coverage issues were more than adequate, and exceeded industry custom and practice for good faith claims handling.

124. Fourth, I disagree with Mr. Thomas's opinion that the timing of Scottsdale's denial in May 2017 was inconsistent with industry custom and practice for good faith claims handling.

125. It is noteworthy that in the Settlement Agreement Messrs. Lucas and Sussman retained all rights under the Policy with regard to any duty to defend. Thus, since NBH is not an insured, NBH does not have any basis to complain about the timing of Scottsdale's denial in May 2017. NBH was not owed any duty of defense, and there is no insurance industry custom or

practice that would call for weighing the interests of a third-party claimant as to a defense.

126. As discussed in my other opinions above, Scottsdale's determinations of coverage were eminently reasonable. They were made appropriately, based on a fair, good faith, and customary reading of the Policy terms and the allegations in the NBH Lawsuit. The arbitration decision does not undermine the reasonableness of Scottsdale's conclusions, and it was not submitted by Messrs. Lucas or Sussman for reevaluation of coverage.

127. In my experience, the allegations in the NBH Lawsuit presented a pattern conduct, including **Interrelated Wrongful Acts** and prior knowledge, that was sufficient to apply the terms of the Policy to deny coverage, without the need for a final verdict or other adjudication. The exclusions at issue apply whenever *any allegations* in a **Claim** fall within the terms of each exclusion. Therefore, the allegations presented by NBH in the NBH Lawsuit, through its complaint and demand letters, were adequate and sufficient grounds to deny coverage.

128. Further, it is reasonable and consistent with the insurance industry's custom and practices for good faith and fair dealing to evaluate extrinsic facts that eliminate all possibilities of coverage. For example, extrinsic facts about the

time when a claim first arose in connection with a claims-reporting period, whether an insurer had prior knowledge that a claim was likely, and whether there were material misrepresentations in an application, may require consideration of extrinsic facts.

129.   Scottsdale acted reasonably by making a fair evaluation of the materials submitted by its Insureds, in light of all the information presented and available. It is again noteworthy that Messrs. Lucas and Sussman did not respond to or challenge in any way Scottsdale's denial of coverage on May 2, 2017. Thus, Messrs. Lucas and Sussman appeared to accept Scottsdale's view of the objective circumstances supporting the denial. Given Scottsdale's history of communications with the Insureds and their representatives, the Insureds understood that Scottsdale would consider and address any additional facts or materials they submitted.

130.   In my experience, carriers who engage in practices that fail to meet insurance industry custom and practice for good faith and fair dealing in claims handling do things like refuse to fund a defense while conducting a claims analysis without communicating with insureds or, in the alternative, take an inordinately long time to issue positions and respond to their insureds' inquiries.

131.    My review of this matter indicates that Scottsdale maintained open lines of communications with the **Insureds** and NBH, it explained its positions clearly and with sufficient factual support and it delayed withdrawing coverage – giving the **Insureds** the benefit of the doubt – for longer, in my opinion, than many insurance carriers would done in similar circumstances.

132.    As far as I can tell, the crux of Mr. Thomas's conclusion that Scottsdale acted in bad faith is that ultimately the company determined that coverage was not available under the Policy for the NBH Lawsuit – a coverage determination with which I agree.

133.    Further, Mr. Thomas seems to ignore the fact that NBH is not an **Insured** under the Policy and has no rights to pursue Scottsdale given the Policy's unequivocal prohibition against assignment of policy benefits without Scottsdale's written approval. Scottsdale's actual **Insureds** under the Policy are no longer actively involved in pursuing coverage for the NBH Lawsuit and I fail to see how anyone could draw a conclusion of a lack of good faith and fair dealing on Scottsdale's part under the totality of the circumstances.

134.    If anything, in my view Scottsdale erred on the side of being conservative and **Insured**-friendly when it agreed to fund a defense of the NBH Lawsuit

from the outset and its withdrawal of such funding was clearly justified pursuant to the relevant coverage analysis.

135. For all of the reasons stated above, and based upon my more than 30 years in the insurance industry, I believe that Scottsdale acted reasonably and justifiably in denying coverage for the NBH Lawsuit under the Policy and it met and exceeded insurance industry custom and practice for good faith and fair dealing in claims handling.

The opinions above are my own, arrived at after a review of materials provided to me and with the benefit my more than 30 years of experience in the insurance industry. I reserve the right to modify this report, if warranted, by my receipt of additional facts and information.

Larry Goanos

Highlands, New Jersey

Date: <u>September 29, 2020</u>

4811-1924-2445, v. 1

# LARRY GOANOS

## EXHIBIT 1: *Curriculum Vitae*

50 Grand Tour
Highlands, NJ 07732
917.716.3964
lgoanos@androsriskservices.com

_____

**Founder and CEO**
**Andros Risk Services, LLC**
Highlands, NJ
November 2010 to Present

> **Founder** of insurance consulting firm specializing in all aspects of professional lines insurance. Among services offered: review and analysis of insurance program coverage and structure; risk analysis; claims advocacy; claims and underwriting portfolio audits and analysis; training of underwriters, brokers and attorneys in various insurance products; drafting of policies and applications; assistance in conducting RFPs; performing reinsurance audits; conducting mediation and arbitration proceedings; and providing expert witness services.

**President and Chief Underwriting Officer**
**APRI Group, Inc.**
Red Bank, NJ
September 2015 to November 2016

> **Managed day-to-day** functions of an insurance managing general agency (MGA) specializing in professional lines insurance. Products underwritten included Lawyers Professional Liability (LPL), Fidelity Bonds and Cyber Insurance. Had responsibility for all aspects of the business, including negotiating underwriting guidelines and coverage terms with carriers, drafting insurance policy language and managing relationships with brokers and carriers. APRI Group was a licensed Lloyd's coverholder and was authorized to do business in all 50 states.

**Dean**
**The CLM Claims College – School of Professional Lines**
New York, NY
July 2012 to September 2015

> **Served as Dean** of an educational organization dedicated to teaching insurance professionals best practices in every aspect of insurance claims handling. Played major role in creating and refining curriculum that focused on, among other things, drafting optimal coverage letters, mapping resolution strategies, avoiding allegations of bad faith claims handling and negotiating settlements. Worked with senior Claims managers from leading insurance carriers to create the foremost claims educational organization in the insurance industry.

### President and Chief Marketing Officer
### Professional Indemnity Agency
**(An underwriting subsidiary of HCC Insurance Holdings/Houston Casualty)**
Mt. Kisco, NY
March 2007 to June 2009

**Managed $350 million gross written premium (GWP) subsidiary** of HCC Insurance Holdings, Inc.  Primary lines of business included Directors & Officers Liability Insurance, Employment Practices Liability Insurance, Fidelity Bonds, Kidnap & Ransom coverage and over 200 classes of Miscellaneous Professional Liability (MPL/E&O) Insurance.  Responsible for all aspects of subsidiary, including underwriting, claims, human resources and other administrative/operational functions.

### Managing Director
### Marsh USA
New York, NY – June 2005 to March 2007
San Francisco, CA – November 1996 to November 1998

**Financial Institutions National Practice Leader** for Marsh's FINPRO (Financial and Professional) unit.  Oversaw client relationships and coordinated new business initiatives with financial institution clients throughout the country.  Served as a national resource on professional lines issues for all Marsh offices.  Also worked with Marsh counterparts overseas on various international issues.

### Senior Vice President
### ACE USA
New York, NY
April 2002 to June 2005

**Managed ACE USA's Professional Risk's** Management Liability and Financial Institutions Professional Liability unit on a day-to-day basis.  Insureds ranged from the largest Fortune 500 companies to smaller, privately-held organizations.  Grew the group over three years from seven underwriters and $14 million in GWP to approximately 35 underwriters and over $300 million in GWP.  Was told at first annual review: "*We gave you the keys to a jalopy, and you took it out on the highway and turned it into a sports car.*" Also responsible for a number of other duties, including drafting policy language, negotiating policy terms and conditions, training underwriters and working with  the Claims Department to help resolve complex claims.

2

**Executive Vice President**
**Chief Underwriting Officer**
**National Union Fire Insurance Company of Pittsburgh, Pa. (AIG)**
**Financial Institutions Group**
New York, NY – January 1994 to November 1996; November 1998 to April 2002

>   **Number-two person** in $350 million-plus GWP Financial Institutions Group at
>   National Union.  Duties performed included overseeing all underwriting activities,
>   managing broker and insured relationships, reviewing, drafting and approving policy
>   and endorsement language, developing new products, training and managing
>   approximately 70 underwriters nationwide, working with the Claims Department to
>   help resolve complex claims, and speaking at industry conferences throughout the
>   country. Awarded SICO status at AIG, a prestigious designation reserved for
>   approximately 400 of the company's 80,000 employees at the time.

**Practiced insurance law from 1989 to 1993** at law firms in New York (D'Amato &
Lynch) and Boston (Parker, Coulter, Daley & White.)  Coverage and litigation matters.

## Education

**Boston College Law School**
Newton Centre, MA
Juris Doctor 1987, *Cum Laude*

**Villanova University**
Villanova, PA.
BA, Political Science, 1984; Minor in English, *Cum Laude*

## Publications

### Books

**Author, D&O 101: Understanding Directors and Officers Liability Insurance – A
Holistic Approach** (Wells Media: San Diego 2014; 214 pages). The biggest-selling book
in its publisher's history, **D&O 101** provides an in-depth view of Directors and Officers
Liability Insurance in a textbook-like manner that is infused with real-world war stories
from the author's many years in the insurance industry.

**Warren Buffett** said of **D&O 101**:  "*You write prose with great skill and I imagine you
do the same when you write D&O policies…Congratulations on another terrific book.*"

3

**Author, <u>Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance</u>** (Soho Publishing: New York 2008; 376 pages). Translated into Japanese and released in Japan in hard-copy and e-book form in November 2011.  **<u>Claims Made & Reported</u>** has sold over 3,000 copies and has generated more than $85,000 in donations to five charities.

**Warren Buffett** said of **<u>Claims Made and Reported</u>**:  "*I enjoyed it thoroughly.  The section about 9/11 was particularly moving...I hope our insurance managers got copies as I know they would enjoy it as I did.  It deserves accolades.*"

**Risk & Insurance Magazine**, in a June 2009 review, said of **<u>Claims Made & Reported</u>**: "*In the final analysis, Goanos has written a book that will matter to the professional lines community. From the industry's struggle to survive in the early days, to the launch of new products to fill the needs of evolving industries, to the lives lost nearly a decade ago on that ghastly September morning, Goanos has done his part to shed more light on the hundreds of people involved with professional lines insurance, who they are and what they do.*"

## <u>Other</u>

**Author of numerous articles** published in a variety of insurance industry periodicals.

**Speaker and moderator** on various panels nationwide at events sponsored by groups such as the Risk and Insurance Management Society (RIMS), the Professional Liability Underwriting Society (PLUS), the American Bankers Association (ABA), the Defense Research Institute (DRI), the CPCU Society, The Claims and Litigation Management Alliance (CLM) and the California State Bar Association.

**Formerly a licensed insurance broker** in New York and California.  Was licensed to practice law in New York, New Jersey and Massachusetts before retiring from active practice to pursue insurance career.

| LARRY GOANOS |
|---|
| **EXHIBIT 2: Insurance Publications and Prior Expert Testimony of Last Four Years** |

## INSURANCE PUBLICATIONS

**Books**

D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach (Wells Media: San Diego 2014; 214 pages).

Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance (Soho Publishing: New York 2008; 376 pages).

**Articles**

- "*AmWINS Insurance Q&A: Coverage Letters - What Are They and How Should They Be Handled*?" AmWINS Client Advisory, May 2013; www.amwins.com
- "*California Employers: Be Aware (and Beware!) of Employment Law Changes in 2013,*" AmWINS Client Advisory, February 2013; www.amwins.com
- "*Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations, Part 2,*" AmWINS Client Advisory, December 2012; www.amwins.com
- "*Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations,*" AmWINS Client Advisory, November 2012; www.amwins.com
- "*D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage*, Part 2,*" AmWINS Client Advisory, October 2012; www.amwins.com
- "*D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage,*" AmWINS Client Advisory, September 2012; www.amwins.com
- "*D&O Policy Definitions: Don't Overlook These Critical Terms*, Part 2*" AmWINS Client Advisory, July 2012; www.amwins.com
- "*D&O Policy Definitions: Don't Overlook These Critical Terms,*" AmWINS Client Advisory, June 2012; www.amwins.com
- "*Tuning Up Your Client's D&O Policy, Part 2,*" AmWINS Client Advisory, May 2012; www.amwins.com
- "Tuning Up Your Client's D&O Policy," AmWINS Client Advisory, April 2012; www.amwins.com
- "*Unlocking Dodd-Frank's Insurance Opportunities,*" AmWINS Client Advisory, February 2012; www.amwins.com
- "*Independent Directors' Liability Insurance: An Overview,*" AmWINS Client Advisory, January 2012; www.amwins.com
- "*What is Severability and Why is it Important?*" AmWINS Client Advisory, December 2011; www.amwins.com

- "*What is a Warranty Letter and Why is My Client Being Asked to Sign One*?" AmWINS Client Advisory, November 2011; www.amwins.com
- "*How to Soften the Insured vs. Insured Exclusion in Your Client's D&O Policy*," AmWINS Client Advisory, October 2011; www.amwins.com
- "*Ten Years Later*" [A September 11th Retrospective] Advisen (www.advisen.com), September 10, 2011
- "*Key Considerations for Placing E&O Coverage*," AmWINS Client Advisory, September 2011; www.amwins.com
- "*Navigating the Tricky Waters of EPL Claims Reporting,*" AmWINS Client Advisory, August 2011; www.amwins.com
- "*M&A Insurance: A Unique Solution for Helping a Client Through a Merger or Acquisition*," AmWINS Client Advisory, July 2011; www.amwins.com
- "*Important Insurance Considerations When Performing Due Diligence for Clients*," AmWINS Client Advisory, June 2011; www.amwins.com
- "*Essential Considerations When Buying D&O Run-Off Coverage*," AmWINS Client Advisory, May 2011; www.amwins.com
- "*Excess D&O Follow Form Coverage: Does It Really Follow Form*?" AmWINS Client Advisory, April 2011; www.amwins.com
- "*Dealing With Insurer Litigation Guidelines: Best Practices*," AmWINS Client Advisory, April 2011; www.amwins.com

## **PRIOR EXPERT TESTIMONY**

1.  I was deposed on April 25, 2016 as an expert for the plaintiffs in the lawsuit styled as <u>Verizon Communications, Inc., Verizon Financial Services, LLC and GTE Corporation vs. Illinois National Insurance Company, et al.</u> Case No. N14C-06-048-WCC  (CCLD) pending in the Superior Court of Delaware in and for New Castle County.

2.  I was deposed on January 24, 2017 as an expert for the plaintiffs in the lawsuit styled as <u>First Horizon National Corporation and First Tennessee Bank National Association vs. Houston Casualty Company, Federal Insurance Company, XL Specialty Insurance Company, Alterrra America Insurance Company, Axis Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., RSUI Indemnity Company and Everest National Insurance Company,</u> Civil

Action No. 2:15-cv-2235, pending in the United States District Court for the Western District of Tennessee.

3.     I was deposed on September 13, 2017 as an expert for the plaintiff in the lawsuit styled as <u>LifeLock, Inc. vs. ACE American Insurance Company, et al.</u>, Case No.: CV 2015-013959, pending in the Superior Court of Arizona, in and for the County of Maricopa.

4.     I was deposed on November 13, 2017 as an expert for the defendant in <u>Interstate Fire & Casualty Company, Personally and as Subrogee and/or Assignee of Kluger, Peretz, Kaplan & Berlin, P.L., vs. Axis Surplus Insurance Company</u>, Case No. 2012-35828-CA-01 (31), in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

5.     I was deposed on January 16, 2018 as an expert for three defendant insurance companies (Old Republic Insurance Company, RLI Insurance Company and Allied World Assurance Company, Inc.) in <u>Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI Insurance Company, Allied World Assurance Company (U.S.) Inc. and Berkeley Insurance Company</u>, Case No. CIV 538248 in the Superior Court of the State of California, County of San Mateo.

6.     I was deposed on June 28, 2018 as an expert for the plaintiffs in <u>Michael I. Goldberg, not individually but as Liquidating Trustee of the Rothstein Rosenfeldt Adler, P.A. Liquidating Trust, Robert C. Furr, not individually but as Chapter 7 Trustee of the estate of Banyon 1030-32, LLC and as the Chapter 7 Trustee of the Estate of Banyon Income Fund, LP v. Aon Risk Services Northeast, Inc.</u>,  Case No.: 1:13-cv-21653-KMW in the United States District Court for the Southern District of Florida (Miami Division).

7.     I testified at trial on August 30, 2018 as an expert for three defendant insurance companies (Old Republic Insurance Company, RLI Insurance Company and Allied World Assurance Company, Inc.) in <u>Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI Insurance Company, Allied World Assurance</u>

3

Company (U.S.) Inc. and Berkeley Insurance Company, Case No. CIV 538248 in the Superior Court of the State of California, County of San Mateo.

8.  I was deposed on October 31, 2018 as an expert for the defendant/counterclaim plaintiff in Allied World Surplus Lines Insurance Company v. Richard J. Goettle, Inc., Civil Action No. 1:17-cv-00670S-JD in the United States District Court for the Southern District of Ohio, Western Division.

9.  I was deposed on January 7, 2019 as an expert for the plaintiff/counterclaim defendant in Scottsdale Insurance Company v. CSC Agility Platform, Inc., fka ServiceMesh, Inc., Computer Sciences Corporation and Eric Pulier, Case No.: 2:17-cv-07762-PSG (GJSx) in the United States District Court for the Central District of California, Western Division.

10.  I was deposed on January 18, 2019 as an expert for the claimant in the arbitration styled as Wind Point Partners VII-A, LP, as assignee of Performance Optics, LCC v. Lexington Insurance Company, AAA Case No. 01-17-0005-4347 (Hearing locale: New York, New York).

11.  I was deposed on February 1, 2019 as an expert for the plaintiff in Axis Surplus Insurance Company v. Aletheia Research and Management, Inc. and Does 1 Through 10, Inclusive, Case No. BC485198 in the Superior Court of the State of California, County of Los Angeles.

12.  I testified at an arbitration on March 20, 2019 as an expert for the claimant in the arbitration styled as Wind Point Partners VII-A, LP, as assignee of Performance Optics, LCC v. Lexington Insurance Company, AAA Case No. 01-17-0005-4347 (Hearing locale: New York, New York).

13.  I was deposed on April 25, 2019 as an expert for the defendant in Allied World Specialty Insurance Company F/K/A Darwin National Assurance Company v. Independence Blue Cross, LLC, Civil Action No. 2:17-cv-01463-JS in the United States District Court for the Eastern District of Pennsylvania.

14.  I was deposed on May 3, 2019 as an expert for the plaintiff in <u>Pharmacia Corporation N/K/A Pfizer Inc. v. Arch Specialty Insurance Company, Twin City Fire Insurance Company and Liberty Mutual Insurance Company</u>, Civil Action No. 2:18-cv-00510-ES-MAH in the United States District Court for the District of New Jersey.

15.  I testified at trial on July 2, 2019 as an expert for the plaintiff in <u>Galena Biopharma, Inc. v. Aon Risk Insurance Services West, Inc</u>., Case No. 16CV33844, in the Circuit Court for the State of Oregon for the County of Multnomah.

16. I testified before the Irish Tax Appeals Commission in Dublin, Ireland on February 10, 2020 in a matter concerning Directors and Officers Liability Insurance, Employment Practices Liability Insurance and other lines of commercial insurance in the United States. I am subject to a confidentiality agreement and cannot reveal the client's identity.

17. I was deposed on April 6, 2020 as an expert witness for the plaintiff in <u>Bedivere Insurance Company, F/K/A One Beacon Insurance Company v. Axis Insurance Company</u>, Case No. 17-L-009747, in the Circuit Court of Cook County, Illinois County Department, Law Division.

| **LARRY GOANOS** |
| **EXHIBIT 3 - Materials Reviewed** |

1. Expert Report of Jeffrey E. Thomas and Exhibits
2. Freedom Specialty Claims Handling Operating Standards
3. Scottsdale Claims Notes, Bates stamp starting with Scottsdale_0007354
4. Scottsdale Indemnity Company Business and Management Indemnity Policy No. EK13166204
5. Variable Quota Share Reinsurance Contract Effective June 1, 2015
6. American Bankers Association Insurance Services Bankers Professional Liability Policy Form No. PD 1130 (10 18)
7. Letter from Marcus Williams Young & Zimmerman LLC to VIA International, et al., dated December 30, 2015, with enclosures, Bates stamp starting with Scottsdale_ 0002064
8. Loan and Security Agreement Among VIA International, et al. and NBH Capital Finance, dated August 27, 2013, Bates stamp starting with Scottsdale_0003617
9. Revolving Promissory Note dated August 27, 2013, Bates stamp starting with Scottsdale_0004306
10. Term Promissory Note dated August 27, 2013, Bates stamp starting with Scottsdale_0004312
11. NBH Capital Borrowing Base Certificate, Bates Stamp starting with VIA000635
12. CRC Notice of Loss Letter dated December 30, 2015
13. Letter from Bailey Cavalieri to Louis E. Lupo dated February 26, 2016, Bates stamp starting with Scottsdale_0004363
14. Letter from Bailey Cavalieri to Louis E. Lupo dated June 17, 2016, Bates stamp starting with Scottsdale_0003559
15. Letter from Gardere Wynne Sewell to Bailey Cavalieri dated July 28, 2016, Bates stamp starting with Scottsdale_0003770
16. Letter from Bailey Cavalieri to Gardere Wynne Sewell dated September 8, 2016, Bates stamp starting with Scottsdale_0002941
17. Letter from Bailey Cavalieri to Tim A. Lucas and J.T. Sussman dated November 15, 2016, Bates stamp starting with Scottsdale_0002695
18. Letter from Bailey Cavalieri to Tim A. Lucas and J.T. Sussman dated November 15, 2016, Bates stamp starting with NBH_000108
19. Letter from Bailey Cavalieri to Tim A. Lucas and J.T. Sussman dated May 2, 2017, Bates stamp starting with Scottsdale_0002702

20. Letter from Bailey Cavalieri to Beverly B. Godbey, Esq. of Gardere Wynne Sewell LLP dated May 22, 2017, Bates stamp starting with Scottsdale_0002688
21. Letter from NBH Capital Finance to VIA International, Inc. dated December 5, 2013, Bates stamp starting with Scottsdale_0004043
22. Letter from NBH Capital Finance to VIA International, Inc. dated April 23, 2014, Bates stamp starting with Scottsdale_0004049
23. Letter from NBH Capital Finance to VIA International, Inc. dated May 5, 2014, Bates stamp starting with Scottsdale_0004041
24. Letter from NBH Capital Finance to VIA International, Inc. dated August 14, 2014, Bates stamp starting with Scottsdale_0003975
25. Letter from NBH Capital Finance to VIA International, Inc. dated April 23, 2015, Scottsdale_0002516
26. Letter from Markus Williams to Doug Klein, Louis Lupo and Bellann R. Raile dated December 30, 2015
27. Letter from Markus Williams to Ashley Young, Esq. of Winget, Spadafora & Schwartzberg dated April 14, 2017, with attachments, Bates stamp starting with Scottsdale0122.
28. Complaint in the matter of NBH Capital Finance v. Timothy A. Lucas and J.T. Sussman
29. Complaint in NBH Capital v. Scottsdale Indemnity Company
30. Scottsdale's Amended Answer in NBH Capital v. Scottsdale Indemnity Company
31. Arbitration Decision in NBH Capital v. Timothy A. Lucas and J.T. Sussman, Bates stamp starting with NBH_000535
32. Final Judgment in NBH Capital v. Timothy A. Lucas and J.T. Sussman, Bates stamp starting with NBH_000557
33. Scottsdale's Objections and Responses to NBH's Discovery Requests, Interrogatories and Requests to Admit
34. Scottsdale's Amended Objections and Responses to NBH's Discovery Requests, Interrogatories and Requests to Admit
35. Scottsdale's Amended Response to Interrogatory No.  21
36. Settlement Agreement among NBH Capital Finance, JT Sussman and Tim Lucas
37. Arbitration Agreement among NBH Capital Finance, JT Sussman and Tim Lucas
38. Assignment by JT Sussman, Bates stamp NBH006407
39. Assignment by Tim Lucas, Bates stamp NBH006408
40. Tolling Agreement and Amendment to the Tolling Agreement

41. Expert Report prepared for NBH Capital Finance by Gary Schwartz, dated November 15, 2017, Bates stamp starting with NBH_0001446
42. Supplemental Expert Report prepared for NBH Capital Finance by Gary Schwartz, dated October 1, 2018, Bates stamp starting with NBH_001495
43. Deposition transcript of J.T. Sussman and Exhibits
44. Deposition transcript of Tim Lucas and Exhibits
45. Deposition transcript of Angela Petrucci and Exhibits (Designed by NBH Capital Finance pursuant to Rule 30(b)(6))
46. Deposition transcript of Chris Randall and Exhibits
47. Deposition  transcript of Veronica DeVoe and Exhibits
48. Deposition transcript of Samantha J. Kulig and Exhibits
49. Deposition transcript of Paul M. Tomasi and Exhibits (Designated by Scottsdale pursuant to Rule 30(b)(6))
50. Deposition transcript of Michael Byron Zartman and Exhibits (Designated by Scottsdale pursuant to Rule 30(b)(6))

4825-2118-8301, v. 2