# EXHIBIT 2 TO
# MOTION TO EXCLUDE EXPERT
# TESTIMONY OF LARRY GOANOS

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

**Part I – Opinions and Explanation of Opinions**

I was asked to express opinions as an expert witness regarding whether Scottsdale Indemnity Co. ("Scottsdale") acted unreasonably and/or breached its obligation of good faith and fair dealing in handling the claim of NBH Capital Finance ("NBH") against Timothy Lucas ("Lucas") and J.T. Sussman ("Sussman"), Scottsdale's insureds under a Business and Management Indmmnity Policy issued to VIA International, Inc. ("VIA") that is the subject matter of the case *NBH Capital Finance v. Scottsdale Indemnity Co.*, Case 1:19-cv-02153-DDD-MEH (pending in the United States District Court for the District of Colorado). In my opinion, Scottsdale acted unreasonably and breached its obligation of good faith and fair dealing by putting the insurer's interest in avoiding coverage ahead of the insureds' interest in coverage, by failing to conduct a reasonable investigation of the claim, by denying coverage and withdrawing the defense of the claim without a reasonable factual basis, by failing to provide an appropriately detailed explanation for the denial of coverage and the withdrawal of defense, by failing to properly evaluate and respond to the policy-limits settlement demand, and by failing to consider and evaluate the interests of the insureds in indemnity coverage once the arbitrator had made a decision and judgment was entered by the court. The bases for my opinion, as well as additional subsidiary opinions related to my opinion, are detailed below.

My opinions are based on my independent review of the facts and circumstances of this case in light of my background and experience regarding insurance industry custom and practice, insurance theory (that is, the structure and purpose of insurance arrangements and their operation in practice), and insurance law. My insurance background and experience began in 1986 when I started working on insurance coverage and bad faith matters with Irell & Manella. In 1993 I started teaching Insurance law, which became my primary area of research as an academic. In the course of my career I have learned about insurance industry custom and practice, insurance theory, and insurance law through: review of numerous judicial opinions; review of articles, books, treatises, and papers; participation in conferences,

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

workshops, symposia, and discussions with academics and practitioners; involvement with organizations

of insurance practitioners, academics and lawyers, such as the Tort Trial and Insurance Section of the

American Bar Association, the Insurance Law Section of the Association of the American Law Schools,

the Asia Pacific Risk and Insurance Association, and the American Law Institute; and work as an attorney,

consultant, and expert witness on matters relating to insurance. My curriculum vita is attached as

Exhibit A. My understanding provided the backdrop for my analysis of this specific case. For the facts

and circumstances of this case, I have relied upon the documents identified in Exhibit B.

**The Standard of Care to be Applied**

Even though there is some dispute about which state's insurance law will be applied to this case,

under the law of Colorado and Texas (and many other jurisdictions), an insurer has an obligation to act

reasonably in handling insurance claims. This obligation is applied as a matter of the common law duty

of insurers to act in good faith towards and to deal fairly with their insureds. *See Farmers Group, Inc. v.

Trimble*, 691 P.2d 1138, 1142 (Colo. 1984)("The question of whether an insurer has breached its duties

of good faith and fair dealing with its insured is one of reasonableness under the circumstances.");

*Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997)("an insurer will be liable if the insurer knew

or should have known that it was reasonably clear that the claim was covered"). In addition, insurers

have a duty to handle claims reasonably because of various statutory requirements. *See*, *e.g.*, C.R.S. §§

10-3-1115, 10-3-1116 (applying a statutory penalty if an insurer "delayed or denied authorizing payment

of a covered benefit without a reasonable basis"); Tex. Ins. Code §§ 541.060, 541.060 (prohibiting the

failure "to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim

with respect to which the insurer's liability has become reasonably clear"; the failure "to promptly

provide to a policyholder a reasonable explanation . . . for the insurer's denial of a claim"; "refusing to

pay a claim without conducting a reasonable investigation").

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

In my analysis, I apply this standards of reasonableness through my understanding of insurance industry custom and practice and insurance theory. For example, under insurance industry custom and practice, when an insurer has a potential coverage defense to a liability claim, the insurer would provide a defense for that claim under a reservation of rights. In addition, insurance industry custom and practice is to conduct reasonable investigations, to respond promptly and reasonably to settlement offers, and to fully consider the evidence and arguments provided by the insured. If an insurer determines that part of the claim is covered, but that part is not, insurance industry custom and practice is, at a minimum, to provide insurance benefits for the covered part.[1] It would be contrary to insurance industry custom and practice for an insurer to assume that a claim was not covered, or to deny coverage because of the possibility that a claim may be determined in the future to be outside of coverage.

Insurance theory is an understanding of how insurance is designed to function in practice. Insurance is a mechanism used to pool risk and to transfer it from the policyholder to the insurer. Under insurance theory, insurers are understood to have an incentive to underpay insurance benefits. This is a consequence of the contingent nature of insurance benefits, the relatively low probability of loss, and the reliance on large numbers of insureds to accomplish the pooling purpose. Insurance payments are contingent on a loss occurring. Normally, even though the insured has paid an insurance premium, no benefits are collected because the risk does not materialize into a loss. In an average year, only a small percentage of an insurer's customers will make a claim. As a result, the market consequences of bad behavior are limited to losing a few customers.[2] The common law duty of good faith and fair dealing and the statutory obligations to act reasonably are meant to address this problem. The requirement to act in

---

[1] In some instances, it is insurance industry custom and practice to provide insurance benefits for more than the covered part of the claim. For example, insurance industry custom and practice for liability insurance is to provide a defense for an entire suit even though some parts of the suit are not, or may not be, covered.

[2] The market impact of customer dissatisfaction is not sufficient to prevent insurers from acting in their own interests for a number of reasons, including that customers may not share the information with competitors, that the contingent problem makes the information old, and that negative information may be offset by positive marketing.

3

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

good faith and reasonably requires an insurer to resist its financial incentive to act in its own interest by protecting the interests of the insured, and the statutory duties create a statutory incentive to act appropriately.

**The Initial Claim – December 31, 2015, Demand Letter**

The claim that is the subject matter of this litigation was first tendered to Scottsdale in a demand letter from legal counsel to NBH on December 31, 2015. *See* Claims Notes, Dec. 31, 2015, Bates Scottsdale 7380. In that letter, NBH made demands "against VIA and its officer, directors, agents and employees" and asserted total damages in the amount of $5.4 million "as a result of the wrongful acts of VIA and its officers, directors, agents and employees." Letter from Steven R. Rider to Doug Klein at 1 (Dec. 30, 2015), Bates Scottsdale 92. The demand letter, "[b]ased on the Receiver's research and investigation," noted fourteen actions of VIA and its officers, directors, agents and employees in support of NBH's claim. *Id*. at 2-3, Bates Scottsdale 93-94. These actions pertained to the handling of accounts receivables, inventory, billing of customers, company information, customer deposits, financial records, and company revenues. *Id*.

**Scottsdale Acted Unreasonably by Seeking to Deny Coverage of the Claim**

Even though Scottsdale acted reasonably and consistently with insurance industry custom and practice when it provided a defense to NBH's claim under a reservation of rights, *see* Letter from Darius N. Kandawalla to Tim A. Lucas (Nov. 15, 2016), Bates NBH 108-114, Scottsdale acted unreasonably in response to the initial claim by immediately concluding that the claim was not covered. The claims adjuster testified that his understanding from the outset was that the claim did not involve litigation that would trigger coverage. Deposition of Aaron Klass ("Klass Depo.") at 75. Although the claims notes show that the demand letter alleged "$5.4 M in damages as a result of wrongful acts by VIA and its D&Os, employees and agents," Claims Notes at 27 (Dec. 31, 2015), Bates Scottsdale 7380, the adjuster

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

believed that the claim was against VIA for breach of contract and related issues, which were excluded from coverage. Klass Depo at 76.

On the same day that he received the claim, the adjuster undertook a coverage analysis in which he reserved on the "Prior Wrongful Acts Exclusion" and concluded that if NBH was not a "securities holder," that the "breach of contract exclusion could apply" if the claim was filed on the basis of default. Claims Notes at 27 (Dec. 31, 2015), Bates Scottsdale 7380. Even though the demand letter stated that demands were being made against VIA "**and its officers, directors, agents and employees**" and repeatedly referred to misconduct by VIA's "**officers, directors, agents and employees**," *see* Letter from Steven R. Rider to Doug Klein at 1-3 (Dec. 31, 2015) (emphasis supplied), Bates Scottsdale 93-94, the claims adjuster concluded, consistent with his belief that this was a breach of contract claim, that it was "[u]nclear" if NBH would assert breach of fiduciary duty or other claims as creditor. Claims Notes at 27 (Dec. 31, 2015), Bates Scottsdale 7380. This conclusion was unreasonable. was not supported by the evidence available to him, and reflected an orientation against coverage.[3]

Much of the adjuster's early investigation of the claim was directed towards building a coverage defense against the claim. He did little, if any, investigation of the factual basis for the claim or the defenses that could be raised by the officers and directors. For example, after his initial coverage investigation showed that the continuity date had been amended to October 15, 2015, *see* Claims Notes at 26 (Dec. 31, 2015), Bates Scottsdale 7379,[4] he noted that "Paragraph 59" of the NBH complaint on the loan default (the only paragraph specifically identified) "states that defendants were in default on the

---

[3] Two weeks later, in connection with retention of defense counsel, the adjuster noted: "The [December 31] letter alleges breach of fiduciary duty and other wrongful acts and appears to trigger [the duty to defend]." Claim Notes at 21 (Jan. 13, 2016), Bates Scottsdale 7374.

[4] October 15, 2015, was the continuity date that applied to additional coverage provided to the receivership. *See* Scottsdale Business and Management Indemnity Policy Endorsement No. 43, Bates Scottsdale 91. The declarations page of the 2015-2016 policy showed the continuity date of October 18, 2014. *See* Scottsdale Business and Management Indemnity Policy Declarations at 2, Bates Scottsdale 4. The continuity date in the 2014-2015 policy was August 27, 2013. *See* Scottsdale Business and Management Indemnity Policy Declarations at 2, Bates Alliant 3276.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

loan documents as of 9/25/15." The adjuster's skepticism that the claim was covered was evident when, just two weeks after receiving the demand letter, he recorded that he suspected that NBH bringing suit "may be a ruse to see how insurance folds into this." Claims Notes at 21 (Jan. 13, 2016), Bates Scottsdale 7374. In his deposition the claims adjuster retreated from the term "ruse," testifying that it was probably an inartful term used in an improper manner, Klass Depo. at 103, but he nonetheless characterized NBH's demand as "a ploy" to see if they could get the claim to "register" with the insurance carrier, *Id.* at 102-103. Regardless of which word is used, the statement shows that the adjuster did not give meaningful consideration to the possibility that the claim was covered, or the insureds' interests in being protected from the claim.

<u>Scottsdale Used Defense Counsel for Its Own Purposes</u>

Scottsdale retained defense counsel quickly, within two weeks of the demand letter, *see* Claims Notes at 21 (Jan. 13, 2016) ("emailed Gordon & Rees and assigned them to represent VIA International"), Bates Scottsdale 7374, but because VIA had essentially been liquidated by that time, *see* Claims Notes at 23 (Jan. 8, 2016) (Raile advised that Louis Lupo "was the last remaining D&O (company is now completely liquidated)"), Bates Scottsdale 7376, defense counsel was used by Scottsdale for its own purposes rather than being controlled by VIA or its directors or officers. Because of his suspicion that the NBH demand letter was a ruse, the claims adjuster determined to "discuss strategy with [defense counsel] before they issue any written response" to the letter. *Id*. at 21, Bates Scottsdale 7374. Defense counsel contacted plaintiff's counsel "to ascertain [plaintiff's] goals" and reported back to Scottsdale that NBH "sent the demand letter only to preserve potential claims that might be covered by a D&O policy." *Id.* at 19 (Mar. 7, 2016), Bates Scottsdale 7372. Defense counsel advised Scottsdale "that no affirmative steps [were] needed beyond monitoring at this time." *Id.* Plaintiff's counsel understood that the lawyer represented VIA "but was not told that [defense counsel] represents Lupo or Klein." *Id*.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

Defense counsel analyzed the December 2015 demand letter and possible claims against the directors in place at the time of the demand, but failed to consider claims against prior officers or directors. Counsel opined that NBH did not have "any viable claim against Klein or Lupo" because they "joined VIA after default . . . as a last ditch effort to turn VIA around," and that "[s]uch efforts are unlikely to be actionable by [plaintiff]." *Id.* Counsel noted that VIA "has liability for the debt," but concluded that this liability would be "addressed in the receivership and any subsequent deficiency action." *Id.* Scottsdale relied on this analysis to determine that it need not post any indemnity reserve on the claim. *See* Klass Depo. at 98-99. While defense counsel's perspective on the claim is appropriate to consider, Scottsdale's focus was on avoiding its own liability, not on the protection of the former officers and directors of VIA who were ultimately sued on the claim. This self-serving use of defense counsel is contrary to insurance industry custom and practice.

<u>Scottsdale Did Not Conduct a Reasonable Investigation of the Claim</u>

Beyond a few early phone calls and conferring with defense counsel, the claims notes do not reflect any meaningful effort by Scottsdale to investigate the claim, which was unreasonable and contrary to insurance industry custom and practice. After March 7, 2016, until receiving the NBH lawsuit in October, Scottsdale focused entirely on coverage. *See* Claims Notes at 15-18, Bates Scottsdale 7368-7371.[5] Even though Scottsdale was providing a defense during that time, it began planning to withdraw the defense on the basis of coverage. *See* Claims Notes at 16 (Sept. 1, 2016) (approval of draft supplemental reservation of rights letter "supporting Scottsdale's right to withdraw the defense"), Bates Scottsdale 7369. Scottsdale was so oriented to denying coverage that just three days after receiving the April 14, 2017, policy-limits demand, in anticipation of the denial, the claims adjuster directed defense counsel to cut back on their work on the case. *See* Klass Depo. at 202-203.

---

[5] The only activity not concerning coverage was an update from defense counsel on August 4, 2016, that there had been "no word from [plaintiff's counsel] at all, and no update to provide." Claims Notes at 16 (Aug. 4, 2016), Bates Scottsdale 7369.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

<u>Scottsdale's Use of the Same Adjuster for Coverage and Defense Was Unreasonable</u>

Scottsdale's claims adjuster handled both the coverage issues and the supervision of the defense of the claim. *See* Klass Depo. at 142-143. This is a conflict of interest. As the adjuster handling the coverage claim, he is responsible for protecting the insurer's interest to establish that the claims is not covered so the insurer will not have to pay insurance benefits. As the adjuster handling the supervision of the defense claim, he is responsible to protect the interest of the policyholder. The adjuster's pursuit of the coverage defense in this case interfered with his ability to properly protect the interests of Lucas and Sussman and was unreasonable. Many insurance companies, when handling coverage issues, will have one adjuster handling the coverage matters and direct a different adjuster to handle the supervision of the defense (to "split the file") so as to better protect the interests of the insured. Scottsdale did not do this in this matter, and did not have any other mechanisms in place to protect the interests of the insured when coverage issues were involved.

**Scottsdale's Denial of the Claim and Withdrawal of Defense Was Unreasonable**

Although Scottsdale acted reasonably by initially providing a defense to Lucas and Sussman, its decision to deny the claim and withdraw the defense in May 2017 was unreasonable. The letter sent to Lucas and Sussman by coverage counsel for Scottsdale on May 2, 2017, identified three bases for Scottsdale's denial: 1) the Prior and Interrelated Wrongful Acts Exclusion, 2) the Prior Knowledge Exclusion, and 3) that the lawsuit constituted a claim made prior to the policy's inception. Each of these will be considered in turn.

<u>Scottsdale's Denial Based on the Prior and Interrelated Wrongful Acts Exclusion was Unreasonable</u>

The Prior and Interrelated Wrongful Acts exclusion was added to the Scottsdale policy by endorsement 32. It provides that Scottsdale is not liable "for **Loss** under this [Directors and Officers] Coverage Section on account of any **Claim**: alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

8

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

1. any **Wrongful Act** actually or allegedly committed prior to 8/27/2013, or

2. any **Wrongful Act** occurring on or subsequent to 8/27/2013 which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**"

Scottsdale Business and Management Indemnity Policy Endorsement No. 32 (bold type in original), Bates Scottsdale 74. "**Wrongful Act**" is defined as "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by: a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity." Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 3, Bates Scottsdale 25. "**Interrelated Wrongful Acts**" is defined as "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes." *Id*. at 2, Bates Scottsdale 24.

Under insurance theory, the purpose of this exclusion is to allocate the risk of wrongful acts to the correct policy and the correct policy period. Wrongful acts that occur prior to the specified date would be the responsibility of a prior insurance policy, if any. To the extent that a wrongful act is part of interrelated wrongful acts, the interrelated wrongful acts are treated together so that the policy applicable to the first interrelated wrongful act, if any, would cover all of the interrelated wrongful acts.

*Scottsdale Did Not Have A Reasonable Factual Basis for Denial Based on the Prior and Interrelated Wrongful Acts Exclusion*

Scottsdale's reliance on the Prior and Interrelated Wrongful Acts Exclusion was unreasonable because Scottsdale did not have a reasonable factual basis for reliance on this exclusion. The May 2 letter asserts that Lucas and Susman submitted "consolidated financial statements containing misrepresentations regarding inventory and accounts receivable to NBH (and other banks) in connection with VIA's attempts to secure a loan." Letter from Darius N. Kandawalla to Tim A. Lucas at 2 (May 2, 2017), Bates NBH 496. In support of this conclusion, the letter relied upon paragraph 48 of the

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

complaint and pages 4 and 5 of the policy-limits demand letter. *Id*. Although these documents support the conclusion that Lucas and Sussman had knowledge about accounting challenges related to inventory and accounts receivables, **they do not demonstrate that financial statements to NBH contained misrepresentations**. Paragraph 48 of the Complaint alleges that "Lucas and Susman became aware during the period between June and November 2013 that VIA subsidiaries were not maintaining accurate periods of inventory and accounts receivables." Complaint, *NBH Capital Finance v. Lucas* ¶ 48. Similarly, the policy-limits demand letter states that in April 2013 "Sussman responded to an email . . . by acknowledging the company's problems with billing, accounts receivables, and accounting for revenues." Letter from Steven R. Rider to Ashley Young at 4 (April 14, 2017), Bates Scottsdale 125. Because Lucas and Sussman knew of the accounting problems, Scottsdale simply assumed that they must have made misrepresentations in the documentation to the banks.

NBH did not allege misrepresentations in the financial documentation used to obtain the loans to VIA. The Complaint against Lucas and Sussman did not allege any such misrepresentation, and therefore no such purported misrepresentations were part of the arbitration. *See* Findings of Fact, Conclusions of Law, and Final Award at 4 (April 18,2019) (noting that NBH "was not pursuing Lucas or Sussman" for preparing financial information prior to the consolidation).

The facts do not support Scottsdale's assumption that the financial information used to secure the loans included misrepresentations. VIA was created on August 27, 2013, so did not have financial reports of its own prior to that time. To assist lenders, Lucas worked with Sussman to take financial information from the individual companies that were being combined to form VIA and consolidate and normalize the information in a pro forma for the lenders. *See* Deposition of Tim Lucas ("Lucas Depo.") at 31-32. In addition, each of the individual companies had financial statements through calendar year 2012. *Id.* at 52-53. Lucas used the individual companies' financial information to build a cash-flow model, *id.* at 95, which was shared with lenders, *id.* at 99. Lucas provided NBH with the pro forma

10

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

financials, projections, and, with Sussman's help, everything NBH asked for such as individual tax returns, years of accounts receivables history, and years of inventory accounts. *Id.* at 108-109. NBH took approximately 45 days to review this information and conduct a due diligence investigation before agreeing to the loan. *Id.* at 113 Lenders did not express concerns about reliable financials during the loan origination process; financial information had been corroborated and all of the independent businesses had been in operation more than 10 years. *Id.* at 56. To the extent that the consolidation of businesses created some risks when they were to be integrated, including risks associated with the accounting system, NBH was aware of those risks at the time of loan origination and was willing to take those risks. *See* Response to Settlement Offer and Compromise of Claims at 1, Bates Scottsdale 4677 (Lucas writing).

Although Lucas and Sussman knew that there were problems in integrating the accounting systems of the independent companies, they were working to address these problems by transitioning to the NetSuite accounting system to give a single view of all VIA's financial statements. *See* Lucas Depo. at 54. It was only when the accounting system had been consolidated that the cash-flow problem became apparent, *id.* at 92, at the very end of 2013 or early in 2014. While this cash-flow problem was a concern, it was not so great that VIA could not pay its bills. *Id.* at 101. VIA needed to cut its expenses, and it had been part of the business plan to reduce expenses by $2 million, although some of the founding members were reluctant to make the necessary cuts. *Id.* at 96-97. Another possible solution to the cash-flow problem was to secure additional investment funds. VIA was discussing a possible cash infusion in early 2015. *Id.* at 214.

> *Scottsdale Did Not Conduct a Reasonable Investigation into the Factual Basis for the Prior and Interrelated Wrongful Acts Exclusion*

Scottsdale's reliance on this exclusion also shows that its investigation was unreasonable. Scottsdale made no effort to investigate the financial statements used to obtain loans from NHB or the circumstances of those loans. Instead, Scottsdale relied upon a self-serving interpretation of information

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

provided in the policy-limits demand, which was the primary factual basis for the denial. *See* Klass Depo. at 198 (denial of coverage based on the demand letter), 244 (attachments to policy-limits demand were the central focus as the basis for the denial), and 245-246 (denial not based on any other information besides the policy-limits demand) . The policy-limits demand letter includes no allegation that Lucas or Sussman made misrepresentations in connection with obtaining the loans prior to August 27, 2013. Although the documents attached to the policy-limits demand were voluminous, more than 350 pages, only three documents (a collection of emails and attachments) were generated prior to August 27, 2013, and none of them show any misrepresentations of financial information. The loan document included a Pro Forma Balance Sheet, but nothing in the attachments suggests that the amounts represented in that balance sheet were incorrect.

The Pre-August 27 documents included with the policy-limits demand show that Lucas and Sussman were working for accuracy, not seeking to make misrepresentations. For example, in an April 19, 2013, email Lucas said to Sussman that they "need to pay attention to reported balances for inventory and AR. My gut is that they are all a little heavy." Email from Tim Lucas to J.T. Sussman (April 19, 2013 at 5:44 PM), Bates Scottsdale 153. Sussman responded: "Agreed" and concludes that there is "Lots to look at – we'll keep the dialogue going." In an April 25, 2013, email, Sussman provides a spreadsheet to show a potential lender (not NBH) how VIA "will be billing and determining whether they have billing in excess of revenues or revenues in excess of billings." Email from J.T. Sussman to Taylor Bond (April 25, 2013 12:18 PM), Bates Scottsdale 156. He also provides an attachment to show "the current thinking" and how VIA "will be treating these amounts from an accounting perspective." *Id.* This shows transparency on the part of Lucas and Sussman, but the email also notes that the system was still a work-in-progress, as the approach was "not finalized and approved by VIA." *Id.* The third document that pre-dates August 27 was an email from Lucas to the founding members of VIA asking them for financial information. *See* Email from Tim Lucas to Randy Stearns et al. (April 30, 2013 10:30 AM), Bates

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

Scottsdale 186. This shows that Lucas is working diligently to collect and assemble the information required for the loans, and that the information is extensive; it does not provide any evidence of any alleged misrepresentation.

The demand letter includes Lucas's employment contract, which shows that he was hired on September 1, 2013, **after** August 27, 2013. *See* Lucas Employment Agreement at 1, Bates Scottsdale 137. This fact would lead a reasonable claims adjuster to investigate whether conduct prior to September 1, 2013, could amount to a "wrongful act" under the policy. Prior to being employed by VIA, Lucas was an independent contractor, not an officer or director. *See* Lucas Depo. at 26-27. In that role, while he worked with financial records, he did not have the same kind of access to information or control as when he was the Chief Financial Officer. As an independent contractor, he had no access to the books and records of the individual companies that were being combined for form VIA, *id.* at 18, and had no control over the financial statements of those companies, *id.* at 204-205. Similarly, Sussman was an independent contractor until he was hired as controller in October 2015. *See* Findings of Fact, Conclusions of Law, and Final Award at 3 (April 18, 2019). Scottsdale acted unreasonably by failing to investigate the roles and conduct of Lucas and Sussman prior to being hired as officers of VIA.

<u>Scottsdale's Denial Based on the Prior Knowledge Exclusion was Unreasonable</u>

Scottsdale's denial of coverage for Lucas and Susman based on the Prior Knowledge Exclusion was also unreasonable. That exclusion applies to any claim "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** were such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**." Scottsdale Management and Indemnity Policy Directors and Officers and Company Coverage at 5, Exclusion C1(l) (bold type in original), Bates Scottsdale 27. Thus, for the exclusion to apply, Scottsdale has to prove two things: 1) that an insured

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

had knowledge of wrongful acts prior to the continuity date, and 2) that the insured had reason to believe that the wrongful act could reasonably be expected to give rise to the claim.

Like the previous exclusion, the purpose of the Prior Knowledge Exclusion is to allocate claims to the proper policy year. The directors and officer's coverage is provided on a claims-made basis, and the insurer relies on the insured to give notice of claims as they develop. Under the policy, the insureds are obligated to give notice of any claim "as soon as practicable." *Id*. at 7, Notification E1, Bates Scottsdale 30. The Prior Knowledge exclusion creates an incentive for the insured to give notice when they have reason to believe a claim may be made, and such notice will trigger the coverage of the policy in place at the time of the notice. *See id*. at 7, Notification E2 (giving notice of a wrongful act "which may reasonably give rise to a future **Claim**" will be "deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**").

> *Scottsdale Did Not Have A Reasonable Factual Basis for Denial Based on the Prior Knowledge Exclusion*

Scottsdale did not have a reasonable factual basis for the Prior Knowledge exclusion. Its analysis focused on the first part of the exclusion, knowledge of wrongful acts prior to the continuity date,[6] and simply assumed that such knowledge would satisfy the second requirement of the exclusion, that an insured had reason to believe that the knowledge of wrongful acts could reasonably be expected to give rise to the claim. This is not the case; under insurance industry custom and practice an insurer relying on this exclusion must meet both requirements. Even though there is evidence from which one could argue that there was knowledge of purported wrongful acts prior to the continuity date,[7] Scottsdale did not

---

[6] For purposes of my analysis, I have assumed the continuity date of Oct. 18, 2014. However, Scottsdale failed to consider whether the proper continuity date was August 27, 2013, the original continuity date. Although the policy had been cancelled, it was reinstated at the same premium, which gave VIA reason to believe that policy was the same as it had been before cancelation. The change of the continuity date to Oct. 18, 2014, was a material change in the coverage, and should have been communicated more prominently and more directly to VIA. Unless there was some offsetting indication of an increase in risk, the changing of the continuity date should have reduced the overall risk to the insurer and should have resulted in a lower premium.

[7] Although there is some evidence from which one might conclude that there was prior knowledge, I did not fully evaluate whether that evidence was sufficient to constitute a reasonable factual basis for the first element of the

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

identify or rely upon reasonable evidence to support its conclusion that the insureds had reason to believe that the wrongful acts could be expected to give rise to the claim.

Much of the factual basis for Scottsdale's attempted application of the Prior Knowledge exclusion was a rehash of the factual basis for the Prior Wrongful and Interrelated Wrongful Acts exclusion, and is similarly without a reasonable basis. In particular, Scottsdale again asserts that Lucas and Sussman "allegedly provided inaccurate financial statements to NBH prior to securing the NBH loans." Letter from Darius N. Kandawalla to Tim A. Lucas at 4 (May 2, 2017), Bates NBH 498. As explained above, neither the complaint nor the policy-limits demand suggest that there were misrepresentations in acquiring the loan, or that such misrepresentations were made by Lucas and/or Sussman. Similarly, Scottsdale suggests that a statement in an April 2013 email is evidence of knowledge of wrongful acts when, as explained above, the context of the email and its response shows that Lucas and Sussman were working to improve the accuracy of financial reporting, not trying to hide financial errors. Scottsdale asserted that the policy-limits demand contained "more examples demonstrating that each of you acknowledged that VIA's accounting processes and financial statements did not accurately report VIA's inventory and accounts receivable," *id.* at 3, Bates NBH 497, but Scottsdale made no effort to determine whether those alleged examples were prior to the continuity date. While Lucas and Sussman were aware of accounting problems, they were working to fix those problems, not ignoring them. *See See* Findings of Fact, Conclusions of Law, and Final Award at 6 (April 18, 2019) (Lucas and Sussman were aware of the accounting problems, but "testified that they believed the problems were not serious and could be solved through appropriate measures, including the implementation of NetSuite.").

---

exclusion because there was so little evidence to support the second element. Should this become an issue in the litigation, and/or should additional evidence be produced as to the knowledge of the insureds, I reserve the right to consider that evidence and reach a conclusion as to the sufficiency of the evidence of knowledge of wrongful acts prior to the continuity date.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

*The RedRidge Report Did Not Support Applicability of the Prior Knowledge Exclusion*

Scottsdale's bases for its assertion that Lucas and Sussman had knowledge that could reasonably be expected to give rise to a claim against them were not reasonably supported. The first basis was the RedRidge field examination of VIA's accounts in August 2014. Scottsdale asserts that the RedRidge examination shows NBH was "actively investigating a potential Claim prior to the Continuity Date." Letter from Darius N. Kandawalla to Tim A. Lucas at 4 (May 2, 2017), Bates NBH 498. In fact, the RedRidge field examination was meant to "be used to assist NBH in lending decisions," RedRidge Finance Group, Updated Field Examination of Via International, Inc. and Affiliates at 4 (Jan. 13, 2015), Bates Scottsdale 467, not in preparing for litigation. Moreover, the August 2014 fieldwork was "was suspended to allow the Company [VIA] time to fully integrate division into a consolidated reporting system (NetSuite)." *Id*. On November 30, 2014, (after the continuity date)[8] "NBH reengaged RDS to perform a remote analysis on the Company's A/R, inventory and reporting capabilities in an attempt to recalculate availability." *Id.* at 5, Bates Scottsdale 468. As with the initial field work, this analysis was to assist in lending decisions; to "recalculate availability" would be of no use in preparing for litigation.

In addition, the RedRidge report provides facts that undermine Scottsdale's assumption that RedRidge involvement gave Lucas and Sussman reason to expect that the accounting problems would lead to a claim. The fieldwork was suspended to allow VIA to work on additional consolidation and implementation of NetSuite. Had NBH been intent on litigation, it would not have given VIA this additional time. In addition, RedRidge work identified problems for VIA to address to improve the accounting system. VIA reported that "many of the previous issues and reporting limitations discovered during August 31, 2014 [RedRidge] fieldwork had been resolved." *Id.* Thus, the RedRidge report would

---

[8] Because RedRidge suspended its fieldwork giving VIA an opportunity to consolidate financial records and implement NetSuite, and then was reengaged on November 30, 2014, the earliest that Lucas and Sussman would have reason to believe that a claim was reasonably likely would have been sometime after November 30, 2014, if at all.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

lead Lucas and Sussman to believe that they were making progress in addressing the accounting

problems, not that a claim against them was imminent.

*Notices of Default Did Not Support Applicability of the Prior Knowledge Exclusion*

The notices of default, which are the second basis relied upon by Scottsdale for its assertion that

Lucas and Sussman had reason to know of a claim against them, likewise show that Lucas and Sussman

did not have reason to expect to be sued prior to the October 14, 2014, continuity date. The policy-limits

demand letter, which Scottsdale relied upon in making its decision to decline coverage, only refers to a

default in October 2015, *see* Letter from Steven R. Rider to Ashley Young at 10 (April 14, 2017), Bates

Scottsdale 131, which is after the October 14, 2014, continuity date. While other default notices were

given by NBH, Scottsdale does not identify any notices, their contents, or their resolution. Borrowers

default for a host of reasons, and the fact that a borrower has defaulted is not reason for the officers

and directors to believe that a suit against them is imminent. The complaint, the other document relied

upon by Scottsdale, states that "VIA was in default under the terms of the Loan Documents" as of

September 25, 2015, Complaint, *NBH Capital Finance v. Lucas* ¶ 35, again well after the October 14,

2014, continuity date. The September 25, 2015, default was resolved by a Fourth Amendment to Loan

and Security Agreement and Forbearance Agreement, extending forbearance until October 30, 2015.

*See id.* Earlier defaults were likewise resolved through negotiated solutions. *See id* ¶ 23 (identifying four

amendments to the loan documents that include waiver of defaults and forbearance agreements).

The facts show that Lucas and Sussman did not have reason to believe they were likely to be

sued prior to the October 14, 2014, continuity date. Although Lucas and Sussman were aware of

accounting challenges for VIA, they testified under oath at the arbitration that "they believed the

problems were not serious and could be solved through appropriate measures, including

implementation of NetSuite." Findings of Fact, Conclusions of Law, and Final Award at 6 (April 18,2019).

It was not until November 2014, after the continuity date, that Lucas determined that there was a

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

problem with NetSuite. The arbitrator found that in November 2014 "Lucas was surprised to learn about the problems generated by the systems he had sought to put in place for VIA." *Id.* at 10. In an email to Sussman on November 13, 2014, Lucas "concluded that NetSuite and the systems he chose were not working." *Id.* Notwithstanding these challenges, Lucas did not expect that he had personal exposure for VIA's loans. The default notices did not give him reason to expect a possible claim because VIA was still working in a positive way with NBH. Lucas Depo. at 230. In the February/March 2015 time frame when he left VIA, Lucas did not have reason to believe he could be sued; VIA had strong sales and was looking for a cash infusion from an investor. Lucas Depo at 214. Both he and Sussman were surprised when they were served with the summons and complaint. *Id.* at 159-160.

> *Scottsdale Did Not Conduct a Reasonable Investigation into the Factual Basis for the Prior Knowledge Exclusion*

Scottsdale's reliance on the Prior Knowledge Exclusion was unreasonable because Scottsdale failed to conduct a reasonable investigation into the factual bases for the exclusion. Under insurance industry custom and practice, insurers conduct a thorough investigation before declining coverage. If there is not sufficient time to complete the investigation, the insurer can request additional time or provide a defense while still reserving its rights. Scottsdale's reliance on the Prior Knowledge Exclusion was also unreasonable because Scottsdale did not have a reasonable basis for concluding that Lucas and Sussman had reason to believe prior to the continuity date that the purported wrongful acts could reasonably be expected to give rise to this claim. The RedRidge report showed that Lucas and Sussman had reason to believe that the accounting problems could be addressed, and the defaults by VIA had been remedied to the satisfaction of NBH until the October 30, 2015, default, which was well after the continuity date.

<u>Scottsdale's Denial Based on the Claim Being Prior to Inception Was Unreasonable</u>

Scottsdale's third basis for its May 2, 2017, denial, that the lawsuit was based on a claim made prior to the policy's inception, was without reasonable support. Scottsdale asserted that a notice of

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

default dated April 23, 2014, which demanded a default fee of $2,500, "constitutes a claim." Denial

Letter at 5, Bates NBH 499. Scottsdale then asserted that this claim "involves the same Wrongful Act(s)

or Interrelated Wrongful Act(s) alleged in the Lawsuit (*i.e.* default on the NBH Loans)," resulting in the

date of the claim being April 23, 2014, prior to the inception of the policy. Scottsdale does not explain

how the April 24 default constitutes a "wrongful act" under the policy, or what purported wrongful act is

associated with that default. Scottsdale simply assumes, without explanation, that because the basis for

damages in this case is default on the loan, that any default must therefore be a wrongful act under the

policy. This assumption is not supported by a reasonable understanding of the language of the policy.

> *Scottsdale's Denial Based on the Claim Being Prior to Inception of the Policy Is Not Supported by the Language of the Policy*

Scottsdale's argument that the claim pre-dates the policy is unreasonable because it is not

supported by the language of the policy. The coverage at issue here (A1) is for wrongful acts of officers

and directors, which is defined as "any actual or alleged error, omission, misleading statement,

misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the

Directors and Officers, while acting in their capacity as such." Scottsdale Business Management and

Indemnity Policy Directors and Officers and Company Coverage Section at 3, Definition B9 (Wrongful

Act), Bates Scottsdale 24. The interrelated wrongful act definition simply aggregates wrongful acts that

have "a common nexus." *Id.* at 2, Bates Scottsdale 24. Thus, this claim against Lucas and Sussman, who

are officers of VIA, is only to be aggregated with other wrongful acts of directors and officers with a

common nexus. The default on April 23, 2014, if a wrongful act at all,[9] was an act of VIA, not of its

---

[9] Because the default was a breach of contract, which is excluded by the policy, *see* Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 5-6, Exclusions C2a, Bates Scottsdale 27-28, it may not constitute a wrongful act. In addition, it appears that the default was ultimately waived. *See* Complaint, *NBH Capital Financial v. Lucas* ¶ 23(a) (referencing First Amendment to Loan as Security Agreement and Waiver of Defaults). Thus, the claim had been settled without insurance so would not be a basis for aggregation. Furthermore, the $2500 "default fee" may not come within the definition of "loss" because "fines or penalties" are excluded. *See id.* at 2, Bates Scottsdale 24.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

officers and directors.[10] A claims adjuster following insurance industry custom and practice would not deny coverage for this claim against Lucas and Sussman because the company for which they worked had received a notice of default prior to the policy.

> *Scottsdale's Denial Based on the Claim Being Prior to the Inception of the Policy Was Not Reasonably Explained*

Scottsdale's denial is also unreasonable because it did not explain the factual basis for Scottsdale' assertion that the default was a wrongful act or how that purported wrongful act was related to the claim against Lucas and Sussman. Under insurance industry custom and practice, denial letters should provide a thorough explanation of the basis for the insurer's position so that an insured will have the opportunity to address any misunderstanding of the insurer. Because Scottsdale did not explain how the default was a wrongful act within the meaning of the policy, and did not explain how that purported wrongful act related to the claims being asserted against Lucas and Sussman, they were deprived of the opportunity to correct Scottsdale's mistake.

> *Scottsdale Did Not Have A Reasonable Factual Basis for Denial Based on the Claim Being Prior to the Inception of the Policy*

Scottsdale's assumption that the default in April 23, 2014, is interrelated with the claim against Lucas and Sussman is not supported by the facts. The defaults in 2014 were for technical violations of the loan agreement, not for failure to make required payments. The defaults in 2014 were because VIA did not maintain the required total leverage ratio. *See* Lucas Depo. at 125. To remedy the ratio, VIA simply had to reduce its debt by paying back part of the revolving line of credit, *see id.* at 233, which VIA did on occasion. *See id.* at 125. When VIA triggered one of these technical defaults, it would result in an internal review by NBH and some discussion with management at VIA to determine whether it represented a financial risk. *See* Lucas Depo. at 124. If that review suggested that the business was on a

---

[10] The coverage provided for wrongful acts of the VIA, is "only with respect to Insurance Clause 3 [coverage A3]." *See* Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 3, Definitions B9 (Wrongful Act), Bates Scottsdale 24.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

positive track, the default would be waived; if the business was in trouble, the bank could foreclose. *Id.*

Until the default in October 2015, NBH continued to work with VIA. These technical violations did not

jeopardize the financial viability of VIA. *Id.* at 230. The arbitrator found that "[n]one of those covenant

defaults were based on monetary default, but instead were defaults based on VIA missing certain

financial ratios required under the VIA Loan documents." Findings of Fact, Conclusions of Law, and Final

Award at 13 (April 18,2019).

> *Scottsdale Did Not Conduct a Reasonable Investigation into the Factual Basis for the*
> *Denial Based on the Claim Being Made Prior to the Inception of the Policy*

Scottsdale's failure to investigate the factual basis for this ground for denial was also

unreasonable. The claims adjuster testified that he relied solely on the information in the policy-limits

demand letter, Klass Depo at 245-246, which did not contain any details about the defaults in 2014. He

testified that he could not recall if the default notices had anything to do with inventories or accounts

receivables, and did not recall if he or coverage counsel for Scottsdale investigated that purported

connection. *Id.* at 245.

The Warranty Exclusion Was Not a Reasonable Basis for Denial

Scottsdale's May 2, 2017, denial letter includes a footnote referring to the Warranty Exclusion.

This exclusion was not a reasonable basis for Scottsdale's denial of coverage. In the May letter,

Scottsdale said: "In addition to the bases discussed herein, coverage also appears to be fully precluded

by Section D of the Policy's General Terms and Conditions, as amended by Endorsement No. 19 (the

"Warranty Exclusion"), for reasons set for in Scottsdale's November 15, 2016 letter." Letter from Darius

N. Kandawalla to Tim A. Lucas at 4 n.3 (May 2, 2017), Bates NBH 498. This statement is equivocal as to

whether Scottsdale is relying on the Warranty Exclusion, and it provides no factual basis whatsoever for

reliance on the exclusion. In the November 15 letter, Scottsdale refers to VIA's total assets, total

receivables and its cash flow, and then assumes that because VIA was "in liquidation" several month

later, the representations about assets, receivables and cash flow must have been false. *See* Letter from

21

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

Darius N. Kadawalla to Tim A. Lucas at 4 (Nov. 15, 2016), Bates NBH 111. There is no evidence that Scottsdale made any effort to investigate whether the representations were false, or the role of Lucas and Sussman in making the representations. The application was signed by Doug Klein, who replaced Lucas. *See* Renewal Application for Business and Management (BAM) Indemnity Insurance at 4 (Aug. 20, 2015), Bates Mesirow 3376. Relying on an assumption of misrepresentation without any investigation is contrary to insurance industry custom and practice and was unreasonable.

*Scottsdale Did Not Conduct a Reasonable Investigation of Whether Any Purported Misrepresentations Were Intentional or Material*

Scottsdale also acted unreasonably and contrary to insurance industry custom and practice by failing to investigate, or even consider, whether any purported misrepresentation was material or was made with intent to deceive. The Warranty Exclusion only applies to misrepresentations "made with the intent to deceive" or "which materially affects either the acceptance of the risk or the hazard assumed by the insurer." Scottsdale simply assumed that the misrepresentations were intentional or material without any evidence or analysis. The representations made in the insurance application were for an extremely broad range, between $25 and $100 million for assets and gross revenues, so precise figures could be off by tens of millions of dollars but still be accurate for the required disclosures. Where the insurer uses such wide ranges, it is less likely that a discrepancy would be material to underwriting.[11] As for intention, Scottsdale the claim was for negligent misrepresentation; intentional misrepresentation was not alleged or proven. The arbitrator found that neither Lucas nor Sussman made misrepresentations "intentionally or with any intent to defraud NBH or any other individual or entity." Findings of Fact, Conclusions of Law, and Final Award at 12 n.3 (April 18,2019).

---

[11] Scottsdale also failed to consider that VIA disclosed that it was losing money in 2015. The application disclosed that in the prior year VIA had a net loss of over $5,000,000. *See* Renewal Application for Business and Management (BAM) Indemnity Insurance at 2 (Aug. 20, 2015), Bates Mesirow 3376. Thus, VIA disclosed that it had some financial difficulties, yet Scottsdale renewed the policy.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

**Scottsdale's Reliance on the April 14, 2017 Letter to Withdraw Its Defense Was Unreasonable**

Not only did Scottsdale unreasonably rely on the April 14, 2017, policy-limits demand in lieu of conducting its own investigation of the facts (as explained above), Scottsdale also acted unreasonably by relying on the policy-limits demand to withdraw from providing a defense to Lucas and Sussman. Under insurance industry custom and practice, the duty to defend is understood to be broader than the duty to indemnify, and to apply when there is a potential for coverage. The Scottsdale claims adjuster understood and agreed with this standard. *See* Klass Depo. at 38-39. Under insurance industry custom and practice, the duty to defend is to be determined primarily by analyzing the allegations in the complaint in light of the coverage provided by the insurance policy. In general, custom and practice recognizes that evidence extrinsic to the complaint may be used **to support** the possibility of coverage and therefore that the insurer has a duty to defend. However, under insurance industry custom and practice, **use of evidence extrinsic to the complaint to deny the duty to defend is very limited**; evidence relied upon must show definitively that there is no possibility of coverage under the policy.

Scottsdale's use of the policy-limits demand as evidence extrinsic to the complaint to withdraw the defense for Lucas and Sussman was unreasonable and contrary to insurance industry custom and practice. As explained above, the policy-limits demand did not provide evidence to establish that there was no possibility of coverage. It did not establish definitively that Lucas and Sussman as independent contractors had knowledge prior to August 27 of wrongful acts that would be committed by officers and directors of VIA. It did not establish definitively that they had knowledge of wrongful acts prior to the continuity date and that those wrongful acts would be the basis for a claim against them. It did not establish definitively that they committed wrongful acts that caused VIA to technically default on its loans during 2014. Each of Scottsdale's conclusions was fact intensive, and was likely to be, and in fact was, highly contested. The claims adjuster knew that the facts were contested; Lucas and Sussman disputed the information contained in the policy-limits demand. *See* Response to settlement offer and

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

Compromise of Claims, Bates 4677-4682; *see* also Klass Depo. at 151-152 (adjuster aware that Lucas and Sussman denied wrongdoing and adjuster admitted he had no other information to show they admitted wrongdoing). Under insurance industry custom and practice, insurers do not deny a defense (or withdraw from a defense) when the facts to support the application of an exclusion are uncertain or in dispute.

**Scottsdale Acted Unreasonably By Failing to Consider the April 2017 Policy-Limits Settlement Offer**

Scottsdale also failed to evaluate the reasonableness of the settlement offer. Under insurance industry custom and practice, liability insurers have a responsibility to reasonably evaluate settlement offers to protect their insureds against possible adverse judgments. Scottsdale made no effort to protect Lucas and Sussman by giving consideration to the policy-limits demand, *see* Klass Depo. at 199 (denied coverage so did not have opportunity to discuss merits with defense counsel), which was unreasonable and contrary to Scottsdale's obligation to act in good faith. Scottsdale, in its desire to find a basis to deny coverage, apparently believed that Lucas and Sussman were responsible for the misrepresentations made by VIA to NBH. If the allegations of such misrepresentations were untrue, Scottsdale should have continued to defend Lucas and Sussman because the policy provided a defense even if the allegations "are groundless, false or fraudulent." Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 7, Settlement and Defense F1, Bates Scottsdale 29. Having taken the position that Lucas and Sussman were responsible for misrepresentations, Scottsdale, under insurance industry custom and practice, should have evaluated the reasonableness of the settlement offer. Scottsdale made no effort to evaluate the settlement offer. The claims adjuster focused entirely on Scottsdale's coverage defense in response to the letter. *See* Claims Notes at 7-8 (April 11, 2017 through May 2, 2017); *see also* Klass Depo. at 197-198 (adjuster did not get to the stage of evaluating the offer because he thought it was not covered). Because the damages were liquidated and in excess of the policy limits, and assuming that an insurer had determined that the allegations of

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

misrepresentation had a strong factual basis, a reasonable insurer in that situation would have engaged in settlement discussions.

**Scottsdale's Denial in the May 22, 2017, Letter Was Unreasonable**

Scottsdale sent a second denial letter on May 22, 2017, to disclaim coverage for VIA. This letter nearly verbatim repeats the grounds for denial in the May 2, 2017, letter and is unreasonable as to those issues for the same reasons. The May 22 letter, however, raises one coverage defense based on Prior and Pending Litigation. *See* Letter from Darius N. Kandawalla to Beverly Godbey at 2 (May 22, 2017), Bates Scottsdale 2689. This exclusion precludes coverage for any claim "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: I . any prior or pending litigation or administrative or regulatory proceeding, demand letter . . . filed or pending on or before the Continuity Date; or ii. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or . . . demand letter." Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 5, Exclusion C1k, Bates Scottsdale at 27.

The purpose of this exclusion is similar to the purpose of the other exclusions relied upon by Scottsdale: it is meant to allocate risks to the proper policy year. If litigation is pending in a prior policy year, and a claim is related to that litigation, the policy providing coverage for the litigation applies to the related claim.

Scottsdale did not have a reasonable factual basis for its assertion of the Prior and Pending Litigation exclusion. The factual basis for this exclusion, like the Prior Knowledge Exclusion, was that NBH issued notice of default on April 23, 2014, in which NBH demanded payment of a $2,500 default fee. As with the other exclusion, Scottsdale did not analyze the 2014 default to determine if the complaint against Lucas and Sussman was related to the April 2014 notice. Scottsdale simply assumed that because the notice was for a default on the loan, and that because the damages sought from Lucas and Sussman

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

were because VIA defaulted on NBH loans, the two must be related. However, there are many ways that a borrower may default on a loan, and, as explained above, the April 2014 default was due to failure to maintain a proper leverage ratio, not because of any monetary default. *See supra.* Scottsdale acted unreasonably by failing to investigation the relationship between the 2014 defaults and the complaint against Lucas and Sussman, by relying on the exclusion without an adequate factual basis, and by failing to provide a sufficient explanation of the factual basis of the exclusion in the denial letter. Scottsdale also acted unreasonably by raising the defense in its correspondence with VIA, but failing to raise it in its correspondence with Lucas and Sussman, and then persisting with the defense in this litigation. Under insurance industry custom and practice, insurers know that failure to raise defenses in a denial letter can result in a waiver of that defense.

**Scottsdale's Failure to Evaluate the Arbitration Decision was Unreasonable**

Even though Scottsdale continued to monitor the litigation between NBH and Lucas and Sussman, Scottsdale failed to consider and evaluate the arbitration decision entered in the case on April 18, 2019, and confirmed by the court and entered as a judgment on May 6, 2019. The claims notes reflect no activity regarding the arbitration decision. *See* Claims Notes at 1-2 (June 13, 2019 through December 20, 2018),[12] Bates 7354-7355. The claims adjuster testified that he never reviewed the arbitration decision or analyzed it for coverage, and that he did not know if anyone at Scottsdale had done so. Klass Depo. at 258-259. Instead, consistent with Scottsdale's approach to this claim from the outset, the adjuster at the time of the arbitration decision was continuing to "monitor for potential coverage litigation." Claims Notes. at 2 (Mar. 27 and June 13, 2019), Bates Scottsdale 7355. This was contrary to Scottsdale obligation to act in good faith and contrary to insurance industry custom and practice. Scottsdale has an obligation to "pay the Loss of the Directors and Officers for which the Directors and Officers are not indemnified by the

---

[12] This document includes a full page that appears to be entirely redacted after the June 13, 2019 entry. It is unlikely that the review and analysis of the arbitration decision and related judgment by the adjuster would be redacted as that would not be privileged.

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

Company and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period." Scottsdale Business Management and Indemnity Policy Directors and Officers and Company Coverage Section at 1, Insuring Clauses A1, Bates Scottsdale 23. Unlike the duty to defend, which is based on allegations and the potential for coverage, the duty to indemnify is based on the facts as they have been determined through litigation. Here, the arbitration decision included extensive findings of fact and resulted in a judgment entered by the court. Such a decision and judgment under insurance industry custom and practice trigger the duty to indemnify. Scottsdale's failure to even consider its duty to indemnify is evidence of bad faith and that it put its own interests ahead of the interests of its insureds.

The findings of fact by the arbitrator rebut several of the key factual assumptions underlying Scottsdale's denial of coverage. They show that Lucas and Susman were not engaged in wrongful acts prior to August 27, 2013 because Lucas was hired as CFO on September 1, 2013, and that Sussman was hired as Controller on October 16, 2013. Findings of Fact, Conclusions of Law, and Final Award at 3 (April 18,2019). Although Lucas and Sussman had worked with some of the constituent companies of VIA as independent contractors prior to being hired, no claims were asserted against them for their work as independent contractors. *Id.* at 4.

The findings of fact also identify November 2014—which is after the October 18, 2014, continuity date—as time when Lucas and Sussman developed knowledge of their of wrongful acts. Prior to that time, they were aware of accounting problems at VIA, but "testified they believed the problems were not serious and could be solved." *Id.* at 6. According to the arbitrator, "it was not until November 2014 that Lucas determined that NetSuite and the accounting methodology he adopted were not working appropriately." *Id.* at 10. Although Lucas and Sussman made mistakes in handling the accounting problems, the arbitrator found that neither of them "did so intentionally or with any intent to defraud

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

The findings of fact provide additional perspective on VIA's covenant defaults. Those defaults, such as the one in April 2014, were not based on monetary defaults. *Id.* at 13. Consequently, wrongful acts, if any, associated with those defaults were not interrelated with the wrongful acts that resulted in VIA's monetary default. In addition, NBH waived VIA's covenant defaults, *id.*, so they did not constitute claims under the policy.

A reasonable insurer following insurance industry custom and practice would have reviewed the arbitration decision and would have recognized that many of the factual assumptions upon which the denial was based had been determined by the arbitrator in a way the supported coverage. In light of these findings, it was unreasonable for Scottsdale to continue to rely on information contained in the April 2017 policy-limits demand as the basis for its coverage position. A reasonable insurer following insurance industry custom and practice would have re-evaluated its coverage position based on the arbitration decision, and would have supplemented its coverage position with this additional analysis. Because the findings of fact by the arbitrator substantially undermine key coverage defenses, a reasonable insurer in Scottsdale's position would have engaged in discussions after the arbitration decision to try to settle the case. Scottsdale, by doing nothing, acted unreasonably and in bad faith by continuing to seek to protect its own interests rather than those of Lucas and Sussman.

### Part II – Data and Information Considered; Exhibits to be Used

The information reviewed and considered in reaching my opinion is listed on the attached Exhibit B. I have not prepared any exhibits to be used at trial.

### Part III – Witness Qualifications and Publications

I am the Daniel L. Brenner Faculty Scholar, Professor of Law and Associate Dean for International Programs at the University of Missouri -Kansas City School of Law. Insurance Law I my primary research area. I first taught Insurance Law in 1993. I have been Chair of the Insurance Law Section of the Associate of American Law Schools, President of the Asia Pacific Risk and Insurance Association, a

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

member of the Federal Involvement in Insurance Regulation Taskforce of the Tort and Insurance

Practice Section of the American Bar Association, and an Advisor to the American Law Institute's

Restatement of the Law, Liability Insurance project. I am Editor-in-Chief of the New Appleman on

Insurance project for LexisNexis/Matthew Bender & Co. I have taught at University of Chicago School of

Law, Loyola Law School (Los Angeles), Nankai University (in China as a Fulbright Fellow), University of

Connecticut School of Law, and Emmanuel Kant State University (in Russia as a Fulbright Fellow). A more

complete description of my qualifications and experience is included on my Curriculum Vita, attached as

Exhibit A. It also lists my relevant publications in the past 10 years.

**Part IV – Previous Testimony**

I have previously given testimony in the following cases since September 8, 2016:

*Starr v. Allstate Fire and Casualty Ins. Co.*, Case No.: 19-CV-01278-SKC, United States District Court for the District of Colorado, Mar. 4, 2020, deposition testimony

*Aerojet Rocketdyne, Inc. v. Global Aerospace, Inc.*, Case No.: 2:17-cv-01515-KJM-AC, United States District Court for the Eastern District of California, Sept. 13, 2019, deposition testimony

*Lexington Insurance Company and Corizon Health, Inc.*, Arbitration, Nashville, Tennessee, April 16, 2019, arbitration testimony; February 27, 2019, deposition testimony

*American Modern Home Insurance Co. v. Thomas*, Case No. 4:16-cv-00215-CDP, United States District Court, Easter District of Missouri, October 16, 2018, trial testimony; April 4, 2018, deposition testimony (rebuttal); and December 29, 2017, deposition testimony

*American Family Mutual Ins. Co. v. Skow*, Case No. 13 CY-CV10308, Missouri Circuit Court, Jackson county, Missouri, November 6, 2018, trial testimony; September 19, 2018, deposition testimony
*Smith v. Keystone Mutual Insurance Co.*, Cause No. 1422-CC01062, Missouri Circuit Court, Twenty-Second Judicial Circuit (St. Louis City), January 24, 2018, trial testimony

*Malcom v. National American Insurance Co.*, Case No. 1:15-cv-8228, United States District Court, Northern District of Illinois, December 21, 2017, deposition testimony

*Northrop Grumman Guidance and Electronics Co., Inc., v. Employers Insurance Co. of Wausau*, Case No. 1316-CV27418, Circuit Court of Jackson County, Missouri, Sixteen Judicial Circuit, November 7, 2017; trial testimony, June 15, 2017, deposition testimony

*Felix v. CSAA General Ins. Co.*, No. A-15-727642, District Court, Clark County, Nevada, April 12, 2017, deposition testimony

**Report of Jeffrey E. Thomas**
NBH Capital Finance v. Scottsdale Indemnity Co.

*Estate of Max E. Overbey v. Universal Underwriters Ins. Co.*, 11 CY-CV03955, Circuit Court, Clay County, Missouri, April 11, 2017, deposition testimony

**Part V – Fee Schedule**

My fee is $510 per hour, plus expenses, for time expended in preparation and testifying.

Dated: September 8, 2020

Jeffrey E. Thomas

30

**JEFFREY ELLIS THOMAS**
**Daniel L. Brenner Faculty Scholar, Professor of Law & Associate Dean**

University of Missouri – Kansas City            913-220-4271 (voice)
School of Law                                    816-235-5276 (fax)
5100 Rockhill Road                              ThomasJE@umkc.edu
Kansas City, Missouri 64110        http://www.law.umkc.edu/faculty/thomas.htm

## TEACHING POSITIONS

*University of Missouri – Kansas City School of Law,* Professor of Law (2004 and continuing), Associate Professor (2001-1999), Assistant Professor (1993-99)
> Courses: Civil Procedure, Insurance Law, Introduction to Law and Lawyering Processes, Introduction to American Law and Culture, Torts
> Co-Advisor to the Moot Court Program (1993-99)
> Elmer P. Pierson Outstanding Teaching Award (1997)
> Tiera M. Farrow Faculty Scholar (2001-03)
> Daniel L. Brenner Faculty Scholar (2010 and continuing)
> Marvin Lewis Rich Faculty Scholar Award (2020)

*Immanuel Kant State University*, Kaliningrad, Russia, Fulbright Lecturer (Spring 2010)
> Courses: American Legal Method, U.S. Tort Law

*University of Connecticut School of Law*, *Visiting Faculty* (June Term 2002)
> Course: Principles of Insurance

*Nankai University, Department of Law,* Tianjin, China, Fulbright Lecturer (1999-2000)
> Courses: Insurance Law, Civil Procedure, Torts, Law & Economics

*Loyola Law School (Los Angeles)*, Adjunct Professor (Spring 1993)
> Course: Insurance Law

*University of Chicago Law School*, Bigelow Teaching Fellow and Lecturer in Law (1991-92)
> Course: Legal Research and Writing

## ADMINISTRATIVE POSITIONS

*University of Missouri – Kansas City School of Law*, Associate Dean for International Programs (2007 and continuing), Associate Dean for Academic Affairs (2005-07)

*University of Missouri – Kansas City*, Interim Vice-Provost for Faculty Affairs (Spring 2011), Vice Provost for Faculty Affairs (2005-07, 50% FTE; 2003-05, 75% FTE), Faculty Associate, Division of Academic Affairs (2002-03, 50% FTE)

## LEGAL PRACTICE

*Irell & Manella*, Newport Beach, California, Associate (1987-91, 1992-93)
> Litigation, including Insurance Coverage

*United States District Court for the District of Connecticut*, Law Clerk to M. Joseph Blumenfeld (1986-87)

## EDUCATION

*Juris Doctor*, University of California, Berkeley (1986)
> Honors or High Honors Grades in Seventeen of Twenty-One Courses
> Executive Editor, *California Law Review*
> Associate Editor, *Industrial Relations Law Journal*

*Bachelor of Arts, Magna Cum Laude*, Loyola Marymount University (1983)
> Alpha Sigma Nu, Pi Gamma Mu
> Intercollegiate Debate (Ranked 10th Nationally and Placed at 35 Tournaments)

**Exhibit A**

### JEFFREY ELLIS THOMAS

**SELECTED PUBLICATIONS**

Works-In-Progress

> *Plain Meaning and Ambiguity and Insurance Policy Interpretation: A Linguistic and Empirical Exploration*
>
> *An Empirical Analysis of Insurance Claim Litigation in China: Are Consumers Sufficiently Protected?* (with Huan Lijuan and Li Zhen)
>
> *Credit Default Swaps, the Collapse of AIG and Insurance: Hedging Should not be Regulated as Insurance*
>
> *Reasonable Expectations in Insurance: The King is Dead; Long Live the King*

**Journal Articles**

> *Benefits of the U.S. Program for Terrorism Insurance from a Comparative Perspective*, 4 J. OF FIN. PERSPECTIVES 79 (2017)
>
> *The Standard for Breach of a Liability Insurer's Duty to Make Reasonable Settlement Decisions: Exploring the Alternatives*, 68 RUTGERS U. L. REV. 229 (2015)
>
> *Insurance and Cultural Perspectives on Katrina,* 19 WASH. & LEE CIV. RTS & SOC. J. 57 (2012) (prepared for Symposium on Racial Disparities in the Disaster Context)
>
> *Insurance Perspectives on Federal Financial Regulatory Reform: Addressing Misunderstandings and Providing a View from a Different Paradigm*, 55 VILL. L. REV. 773 (2010)
>
> *Insurance Law Between Business Law and Consumer Law*, 58 AM. J. COMP. L. 351 (2010) (U.S. report prepared in response to questionnaire for the 18th International Congress on Comparative Law on Commercial Law)
>
> *Terrorism Insurance: What is the Government's Role?* 15 CONN. INS. L. J. 183 (2008) (prepared for the Searle Center Research Symposium on Insurance Markets and Regulation at Northwestern University Law School) (with Thomas Russell)
>
> *Terrorism Insurance: Issues of Policy, Regulation and Coverage* in NEW APPLEMAN ON INSURANCE, CURRENT CRITICAL ISSUES IN INSURANCE LAW (Appleman journal) (2008)
>
> *The Scope of the Obligation to Pay Claim Expenses* in NEW APPLEMAN ON INSURANCE, CURRENT CRITICAL ISSUES IN INSURANCE LAW (Appleman journal) (2007)
>
> *Ambiguity and Insurance Policy Interpretation* in NEW APPLEMAN ON INSURANCE, CURRENT CRITICAL ISSUES IN INSURANCE LAW (Appleman journal) (2006)
>
> *The Indemnity Principle: Evolution from a Financial to a Function Paradigm*, 10 J. OF RISK MANAGEMENT & INS. 30 (Thailand) (2005) (with Brad Wilson)
>
> *Exclusion of Terrorist Related Harms from Insurance Coverage: Do the Costs Justify the Benefits?*, 36 IND. L. REV. 397 (2003) (part of a Symposium on the Law and Economics of Providing Compensation for Harm Caused by Terrorism held at Georgetown Law Center)
>
> *Insurance Implications of Sept. 11th and Possible Responses,* 35 URBAN LAW. 727 (2002)
>
> Crisci v. Sentry Insurance Company*: The Dawn of the Modern Era of Insurance Bad Faith and Emotional Distress Damages*, 2 NEV. L. J. 415 (2002)

### JEFFREY ELLIS THOMAS

*The Role and Powers of the Chinese Insurance Regulatory Commission in the Administration of Insurance Law in China*, 27 GENEVA PAPERS ON RISK AND INS. 413 (2002)

*Legal Culture and "the practice": A Postmodern Depiction of Rule of Law in America* 48 UCLA L. REV. 1495 (2001)

*Access to the Chinese Insurance Market: A Legal and Practical Analysis*, 2 INTERNAT'L INS. L.J. 179 (2000)

*A Pragmatic Approach to Meaning in Defamation Law*, 34 WAKE FOREST L. REV. 333 (1999)

*An Interdisciplinary Critique of the Reasonable Expectations Doctrine*, 5 CONN. INS. L. J. 295 (1998)

*A Case Study of Bad Faith Refusal to Settle: A Doctrinal, Normative and Practical Analysis of Missouri Law*, 64 UMKC L. REV. 695 (1996)

*Statements of Fact, Statements of Opinion, and the First Amendment*, 74 CALIF. L. REV. 1001 (1986)

## Treatises

INSURANCE SUBROGATION AND CONTRIBUTION, 13 NEW APPLEMAN ON INSURANCE LIBRARY EDITION, (LexisNexis/Matthew Bender & Co.: Newark) (2015) (Editor-in-Chief)

LITIGATION, ARBITRATION AND SETTLEMENT, 12 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2014) (Editor-in-Chief)

SURETYSHIP, 11 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2014) (Editor-in-Chief)

FIDELITY INSURANCE, 10 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2013) (Editor-in-Chief)

INSOLVENCY & BANKRUPTCY, 9 NEW APPLEMAN ON INSURANCE LIBRARY EDITION, Volume 9 & 10 (LexisNexis/Matthew Bender & Co.: Newark) (2013) (Editor-in-Chief)

LIFE INSURANCE AND ANNUITIES, 8 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2012) (Editor-in-Chief)

REINSURANCE, 7 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2012) (Editor-in-Chief)

NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE, Volumes 1, 2, 3 & 4 (LexisNexis/Matthew Bender & Co.: Newark) (2012) (Editor-in-Chief)

MOTOR VEHICLE INSURANCE, 6 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2011) (Editor-in-Chief)

PROPERTY INSURANCE, 5 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2011) (Editor-in-Chief)

SPECIFIC TYPES OF LIABILITY INSURANCE, 4 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2010) (Editor-in-Chief)

COMMERCIAL GENERAL LIABILITY INSURANCE, 3 NEW APPLEMAN ON INSURANCE LIBRARY EDITION, Volumes 3 & 4 (LexisNexis/Matthew Bender & Co.: Newark) (2010) (Editor-in-Chief)

### JEFFREY ELLIS THOMAS

INSURANCE REGULATION, 2 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2009) (Editor-in-Chief)

ESSENTIALS OF INSURANCE LAW, 1 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2009) (Editor-in-Chief)

NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE, Volumes 1, 2 & 3 (LexisNexis/Matthew Bender & Co.: Newark) (2007) (Editor-in-Chief)

UNINSURED AND UNDERINSURED MOTORIST INSURANCE, 3d ed., Volumes 1, 2 & 3 (LexisNexis Matthew Bender & Co.: San Francisco) (2005) (with Alan I. Widiss)

## Supplements & Chapters

*2020 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed) (in press)

*2019 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2018 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2017 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*Terrorism Insurance Coverage*, Chapter 56, 5 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2016)

*2016 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2015 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2014 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2013 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed.

*2012 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*Uninsured and Underinsured Motorist Insurance*, Chapter 65, 6 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2011)

*2011 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2010 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*Insurance Policy Interpretation*, Chapter 5, 1 NEW APPLEMAN ON INSURANCE LIBRARY EDITION (LexisNexis/Matthew Bender & Co.: Newark) (2009)

*2009 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

### JEFFREY ELLIS THOMAS

*2008 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*Spotting Issues in Particular Practice Areas*, Chapter 29, 3 NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE (LexisNexis/Matthew Bender & Co.: Newark) (2007)

*2007 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2006 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE (LexisNexis Matthew Bender & Co.: San Francisco, Rev. 3d ed)

*2005 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, by ALAN I. WIDISS (Matthew Bender & Co.: San Francisco, Rev. 2d ed)

*2003 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, by ALAN I. WIDISS (Anderson Publishing Co.: Cincinnati, Rev. 2d ed)

*2002 Supplement*, Volumes 1-3, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, ALAN I. WIDISS (Anderson Publishing Co.: Cincinnati, Rev. 2d ed)

*Construction of Insurance Contracts*, Chapter 16, THE LAW OF LIABILITY INSURANCE (Matthew Bender & Co. New York: New York 1995)

*Formation of Liability Insurance Policies*, Chapter 4A, THE LAW OF LIABILITY INSURANCE (Matthew Bender & Co. New York: New York 1994)

## Continuing Legal Education Materials

*State Insurance Regulators' Response to COVID-19*, Insurance Regulation Committee of the ABA Tort Trial and Insurance Practice Section CLE (ABA 2020)

*Terrorism Risk Insurance Act: Time to Renew . . . or Rethink?*, Insurance Regulation Committee of the ABA Tort Trial and Insurance Practice Section in conjunction with the National Association of Insurance Commissioners Fall Meeting (ABA 2019)

*Reflections on a Paradigm Shift for Extra-Contractual Liability in the Restatement of the Law, Liability Insurance*, AMERICAN COLLEGE OF COVERAGE AND EXTRACONTRACTUAL COUNSEL ANNUAL MEETING (ACCEC 2017)

*Allen v. Breyers: The Missouri Supreme Court's 2016 Decision Adds Clarity (and Confusion) to Insurers' Duty and Right to Defend their Insureds*, 2017 HOT TOPICS IN LAW AND PRACTICE (UMKC CLE 2017)

*Consequences of an Insurer's Breach of the Duty to Defend: Developments in Missouri Law Against the Backdrop of National Developments and the ALI Restatement of the Law, Liability Insurance* (UMKC CLE 2016)

*Good Faith and Breach of the Duty to Settle: Perspectives form the American Law Institute Principles/Restatement Project on Liability Insurance*, HOT TOPICS IN LAW AND PRACTICE (UMKC CLE 2015)

*The Terrorism Risk Insurance Act: An Industry-Government Partnership*, ABA ANNUAL MEETING MATERIALS (ABA 2008)

*Insurance Coverage for Defective Construction: an Introduction* (KCMBA 2003) [with Lara M. Owens]

### JEFFREY ELLIS THOMAS

*Ethical Considerations for the Defense Attorney* (KCMBA 1999)

*To Insure or Not to Insure: the Contribution of Insurer Ambivalence to Transaction Costs in Construction Defects Insurance Coverage Litigation* for ABA CONSTRUCTION DEFECT LITIGATION CONFERENCE MATERIALS (ABA 1998)

*The Complex Nature of Construction Litigation: the Historical Evolution of a Transaction Costs Problem*, ABA ANNUAL MEETING MATERIALS (ABA 1997)

*Annotated Outline for General Liability Insurance*, CORPORATE AND BUSINESS INSURANCE (UMKC CLE 1996)

*Annotated Outline for General Liability Insurance*, FUNDAMENTALS OF COMMERCIAL INSURANCE (UMKC CLE 1995)

*Selected Developments in Civil Actions*, ANNUAL LAW UPDATE (MoBar CLE 1994)

## Selected Other Publications

*Report: The Need to Renew TRIA (Terrorism Risk Insurance Act)*, as Reporter for the American Bar Association Tort Trial and Insurance Practice Section Task Force on Federal Involvement in Insurance Regulation Modernization (March 27, 2014)

*The Terrorism Risk Insurance Act: An Industry-Government Partnership*, THE BRIEF (quarterly magazine published by the Tort Trial and Insurance Practice Section of the ABA), Summer 2009, at 24.

*The US Model for Terrorism Insurance: an Analysis*, PROCEEDINGS OF THE INTERNATIONAL SECURITY AND COUNTERACTING TERRORISM CONFERENCE (Lomonosov Moscow State 2007)

*Insurance for Terrorism: Analyzing the US Model*, ELEVENTH ANNUAL APRIA CONFERENCE PROCEEDINGS (Asia Pacific Risk and Insurance Association 2007)

*Expert Commentary*, New Appleman Premium Checklists (2007-08) (available on LexisNexis)

*White Paper on Renewal of TRIA (Terrorism Risk Insurance Act)*, as Reporter for the American Bar Association Tort & Insurance Practice Section Task Force on Federal Involvement in Insurance Regulation Modernization (March 6, 2006)

*Regulation of Crop Insurance Agents*, a chapter in Review of Insurance Regulatory Systems, a Report for the US Department of Agriculture prepared under a Federal Grant by the Center for Risk Management and Insurance Research, Georgia State University (2005)

*Update on the Terrorism Risk and Insurance Act of 2002,* OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (Fall 2003)

*Background on the ISO Terrorism Exclusions*, OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (Fall 2002)

*Financial Services in the 21st Century: the Perspective of Insurance*, Remarks from the Association of American Law Schools Annual Meeting, 21 ANNUAL REVIEW OF BANKING LAW 315 (2002)

*An American Law Professor in China: Thoughts on the Future of the Rule of Law*, THE FRONTIER OF SCIENCE OF SOCIETY (May 2001) (in Chinese)

### JEFFREY ELLIS THOMAS

*Chinese Insurance Law and the WTO*, CREATING A COMPETITIVE EDGE IN INSURANCE FOR THE EMERGING ECONOMY (Asia Pacific Risk & Insurance Association Conference Papers 2001)

*Access to the Chinese Insurance Market*, PROCEEDINGS OF THE INTERNATIONAL INSURANCE SOCIETY (International Insurance Society 2001)

*Charles Evans Whittaker: In Pursuit of Perfection*, 60 THE ADVANCE SHEET 1 (Newsletter of the Lawyers Association of Kansas City) (Jan. 2001)

*From the Journals: Insurance Law Abstracts*, 7 CONN. INS. L.J. 665 (2001), 7 CONN. INS. L.J. 313 (2000), 6 CONN. INS. L.J. 511 (2000), 6 CONN. INS. L.J. 187 (1999), 5 CONN. INS. L.J. 815 (1999), 5 CONN. INS. L.J. 475 (1998), 4 CONN. INS. L.J. 843 (1998), 4 CONN. INS. L.J. 443 (1997) (Editor)

*Charles Evans Whittaker*, in UNITED STATES SUPREME COURT (Salem Press 2000)

*Law and Economics for the Appellate Practitioner*, in Newsletter of the Appellate Advocacy Committee, Tort and Insurance Practice Section, ABA (Fall 1999)

*Insurance Law* and *Insurance Defense*, in MAGILL'S LEGAL GUIDE (Salem Press 1999)

*Internet Insights – Interesting Websites*, OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (Fall 1999)

*Selected Recent Case Developments,* OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (Fall 1997)

*Report on the 1996 Insurance Law Program—Mass/Toxic Torts, Insurance Law and Insurance Law Pedagogy*, OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (Spring 1996)

*Internet Insights: Risknet - An Internet Mailing List Devoted to Risk and Insurance Issues,* OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (December 1995)

*Selected Recent Cases,* OCCURRENCES (Newsletter of the AALS Section on Insurance Law) (December 1995)

## Other Publication Activities

*Board of Editors*, THE BRIEF (quarterly magazine published by the Tort Trial and Insurance Practice Section of the American Bar Association) (2017-continuing)

*Adviser*, RESTATEMENT OF THE LAW OF LIABILITY INSURANCE, AMERICAN LAW INSTITUTE (2010-2018) (changed from Principles project to a Restatement in 2014)

*Editor-In-Chief*, THE NEW APPLEMAN ON INSURANCE (LexisNexis Matthew Bender, 2006 and continuing)

*Advisory Board Member*, INSURANCE LAW CENTER (2008-12) (http://law.lexisnexis.com/practiceareas/insurance)

*Peer Reviewer*, GENEVA PAPERS ON RISK AND INSURANCE – ISSUES AND PRACTICE (2008); CONNECTICUT INSURANCE LAW JOURNAL (2007-2008)

*Board of Editors*, CGL REPORTER (published by the International Risk Management Institute) (Fall 2004-Spring 2006)

*Legal Abstracts Advisor*, CONNECTICUT INSURANCE LAW JOURNAL (2001-2006)

*Contributing Editor*, CONNECTICUT INSURANCE LAW JOURNAL (1997-2001)

### JEFFREY ELLIS THOMAS

*Editor*, Occurrences (Newsletter of the AALS Section on Insurance Law) (1995-2000)

**SELECTED PRESENTATIONS**

*An ACCC Dialogue: Will Legislatures Mandate Business Interruption Coverage for Covid-19 Losses?*, Webinar hosted by the American College of Coverage Counsel, April 30, 2020 (with Lorelie S. Masters and Scott Seaman)

*Terrorism Risk Insurance Act: Time to Renew . . . or Rethink?*, Insurance Regulation Committee of the ABA Tort Trial and Insurance Practice Section in conjunction with the National Association of Insurance Commissioners Fall Meeting, Austin, Texas, December 8, 2019

*The Meaning of Plain Meaning*, 2019 Annual Meeting of the American College of Coverage Counsel, Chicago, Illinois, May 9, 2019 (with Jeffrey W. Stempel and Lorelie S. Masters)

*Comparative Perspectives on Consumer Protection through Judicial and Administrative Actions*, Keynote Presentation, 2018 Annual Meeting of the China Association of Insurance Law & Asia Pacific Permanent Forum on Insurance Law, Xiamen, China, November 20, 2018

*Regulation of Insurance Intermediaries*, Insurance Regulation in the United States Training Session for Representatives of the Chinese Baking and Insurance Regulatory Commission, University of Connecticut Insurance Law Center, Hartford, Connecticut, July 10, 2018

Allen v. Bryers: *The Missouri Supreme Court's 2016 Decision Adds Clarity (and Confusion) to Insurers' Duty and Right to Defend*, Hot Topics in Law and Practice, UMKC CLE, Kansas City, Missouri, June 23, 2017

*Extra-Contractual Liability and the Restatement on Liability Insurance Law*, Annual Meeting of the American College of Coverage and Extracontractual Counsel, Chicago, Illinois, May 11, 2017 (panel organizer and presenter, with Michael F. Aylward and Lorelie S. Masters)

*Consequences of an Insurer's Breach of the Duty to Defend: Developments in Missouri Law Against the Backdrop of National Developments and the ALI Restatement of the Law of Liability Insurance*, Hot Topics in Law and Practice, UMKC School of Law CLE, Kansas City, Missouri, June 24, 2016

*Insurer Liability for Bad Faith Failure to Settle*, Invited Lecture, Beijing Foreign Studies University Law School, May 24, 2016

*A Liability Insurer's Failure to Settle: a private law case study of common law evolution compared to a statutory (civil law) approach*, Invited Lecture, La Sapienza University, Faculty of Law, Master's Program in European Private Law, Rome, Italy, April 8, 2016

*The American Law Institute's* Restatement of the Law of Liability Insurance, American College of Business Court Judges, Las Vegas, Nevada, December 6, 2015 (moderator)

*A Liability Insurer's Duty to Settle: perspectives, options and analysis*, Invited Lecture, Zhejiang University of Finance and Economics, Hangzhou, China, October 26, 2015

*Good Faith and Breach of the Duty to Settle: Perspectives form the American Law Institute Principles/Restatement Project on Liability Insurance*, Hot Topics in Law and Practice, UMKC School of Law CLE, Kansas City, Missouri, June 26, 2015

*The Standard for Breach of a Liability Insurer's Duty to Make Reasonable Settlement Decisions*, Presentation from Peer-Reviewed Request for Papers, The American Law Institute's Restatement of the Law of Liability Insurance, Rutgers School of Law – Camden, February 27, 2015

### JEFFREY ELLIS THOMAS

*The Jury's Out: When Is First Party Bad Faith a Jury Question and When Can It Be Resolved As a Matter of Law* (Moderator), INSURANCE COVERAGE LITIGATION COMMITTEE ANNUAL CLE, American Bar Association Tort Trial and Insurance Practice Section, Phoenix, Arizona, February 20, 2014

*U.S. Insurance Law Overview*, Invited Presentation, Islamic University of Indonesia, Yogyakarta, Indonesia, January 15, 2014

*U.S. Perspectives on Chinese Insurance Law*, Invited Lecture, CHINESE INSURANCE LAW FORUM, Nanjing, China, November 3, 2012

*Legal Standard for Breach of a Liability Insurer's Duty to Settle*, Rutgers-Camden Insurance Scholars Workshop, Rutgers-Camden School of Law, Rutgers, New Jersey, October 5, 2012

*Insurance and Cultural Perspectives on Katrina*, Invited Presentation, Washington & Lee University School of Law Journal of Civil Rights and Social Justice Symposium on Racial Disparities in the Disaster Context, Lexington, Va., March 16, 2012

*Credit Default Swaps, the Financial Crisis, and Insurance*, THE ANNUAL MEETING OF THE ASSOCIATION OF AMERICAN LAW SCHOOLS, SECTION ON INSURANCE LAW, New Orleans, Louisiana, January 8, 2010

*The Role of Insurance in the U.S. Financial Crisis*, Invited Presentations, Shanghai Jiao Tong University School of Law, Shanghai, China, December 12, 2009, and Jilin University Law School, Changchun, China, December 9, 2009

*Experts in Insurance: Roles and Rules*, Missouri Bar CLE, Kansas City, Missouri, December 3, 2009

*Insurance Policy Interpretation and the New Appleman Library Edition*, LexisNexis Coffee Break Webinar Series, October 29, 2009

*Insurance Perspectives on Federal Financial Regulatory Reform*, VILLANOVA UNIVERSITY LAW SCHOOL SYMPOSIUM ON FINANCIAL REGULATORY REFORM, Philadelphia, October 10, 2009

*Contractual Indemnification Provisions: Insurance and Non-Insurance Considerations*, the Karl E. Holderle Lecture (invited endowed lecture), Missouri Society of Health Care Attorneys Health Law Seminar, Lake of the Ozarks, Missouri, November 6, 2008

*The Terrorism Risk and Insurance Act: TRIA's Nuts and Bolts and Lessons*, Invited Presentation, ABA Annual Meeting, New York, New York, August 8, 2008

*International Insurance and Lloyds of London*, Invited Lecture, UMKC's Oxford CLE Program, Oxford, England, August 5, 2008

*Insurance Litigation Tips in a Soft Market*, Panel Discussion, Third Annual Lathrop & Gage State of Litigation Conference, Lathrop & Gage L.C., Kansas City, Missouri, May 1, 2008

*Government Support for the Terrorism Insurance Industry: Where do we go from here?*, RESEARCH SYMPOSIUM ON INSURANCE MARKETS AND REGULATION, sponsored by the Searle Center on Law, Regulation and Economic Growth, Northwestern University, Chicago, Illinois, April 15, 2008 (paper presentation with Thomas Russell)

*Emerging Public Policy Issues and Research Issues*, RESEARCH SYMPOSIUM ON INSURANCE MARKETS AND REGULATION, sponsored by the Searle Center on Law, Regulation and Economic Growth, Northwestern University, Chicago, Illinois, April 15, 2008 (panel discussant)

### JEFFREY ELLIS THOMAS

*Terrorism Insurance*, New Appleman Insurance Coverage Webinar, sponsored by Mealy's, April 9, 2008

*Insurance Counsel's Ethical Duties in Light of the Insurer's Obligation to Act in Good Faith*, Invited Presentation, Harris McCausland & Schmitt Annual CLE Retreat, Overland Park, Kansas, April 5, 2008

*Insurance Law: US and China Compared*, Invited Presentation, Southwest University of Political Science and Law, Chongqing, China, March 28, 2008; Wuhan University, Wuhan, China, March 27, 2008

*The US Approach to Government Involvement in Terrorism Insurance: Advantages and Disadvantages*, Invited Roundtable Presentation, THE THIRD INTERNATIONAL SCIENTIFIC CONFERENCE ON SECURITY ISSUES AND COUNTER TERRORISM, Lomonosov Moscow State University, Moscow, Russia, October 26, 2007

*The US Model for Terrorism Insurance: A Government Industry Partnership*, Invited Plenary Presentation, THE THIRD INTERNATIONAL SCIENTIFIC CONFERENCE ON SECURITY ISSUES AND COUNTER TERRORISM, Lomonosov Moscow State University, Moscow, Russia, October 25, 2007

*Insurance for Terrorism: Analyzing the US Model*, Presenter, ELEVENTH ANNUAL ASIA PACIFIC RISK AND INSURANCE ASSOCIATION CONFERENCE, Taipei, Taiwan, July 24, 2007

*Insurance Law: US and China Comparisons*, Invited Presentation, Jilin University Law School, Changchun, China, June 1, 2007

*Terrorism and Insurance: An American Perspective*, Invited Presentation, Zhejiang University School of Law, Hangzhou, China, May 30, 2007

*Fundamentals of US Insurance Law*, Invited Presentation, Southwest University of Political Science and Law, Chongqing, China, May 28, 2007

*US Insurance Law from a Comparative Perspective*, Invited Presentations, Peking University Law School, Beijing, China, May 25, 2007

*Where is the National Debate on Insurance Catastrophic Risks Headed?*, INSURING CATASTROPHIC LOSSES: THE STATUS OF TRIA AND PROPOSED NATIONAL DISASTER BACKSTOPS, (Co-sponsored by Wiley Rein & Fielding and the Connecticut Insurance Law Center, University of Connecticut School of Law), Washington, D.C., November 15, 2006  (invited panelist)

*Renewal of TRIA*, Presentation to the Leaders of various insurance committees of the Tort Trial and Insurance Section of the American Bar Association, THE ANNUAL MEETING OF THE AMERICAN BAR ASSOCIATION, Honolulu, Hawaii, August 4, 2006

*TRIA and Prospects for the Future of Federal Involvement in Terrorism Insurance*, CURRENT ISSUES IN INSURANCE REGULATION,  Continuing Legal Education Program co-sponsored by the ABA Tort and Insurance Practice Section and the Bar of the City of New York, New York, New York, April 28, 2006

*Lessons Learned from Abroad*, CATASTROPHIC RISK INSURANCE: THE SEARCH FOR LONG-TERM SOLUTION, (Co-sponsored by Wiley Rein & Fielding and the Connecticut Insurance Law Center, University of Connecticut School of Law), Washington, D.C., March 23, 2006 (moderator)

*Chinese  Insurance Law*, Lecture for U.S. Students in the UMKC Summer Study-Abroad Program, Peking University School of Law, Beijing, China, May 22, 2005

*U.S. Insurance Law from a Comparative Perspective,* Lecture, Peking University School of Law, Beijing, China, May 22, 2005

**Exhibit A**                                                                      10

### JEFFREY ELLIS THOMAS

*Insurance Issues*, Presentation, PUBLIC POLICY DISCUSSION ON TORT REFORM: THE REASONABLE MIDDLE A TOWN HALL MEETING, A UMKC School of Law Town Hall Meeting for Legislators Lawyers, Judges, Insurance Professionals, Health Care Professionals and Doctors, Jefferson City, Missouri, February 16, 2005

*The Indemnity Principle: Evolution from a Financial to a Function Paradigm*, Presenter, EIGHTH ANNUAL ASIA PACIFIC RISK AND INSURANCE ASSOCIATION CONFERENCE, Seoul, Korea, July 21, 2004

*U.S. Insurance Law*, Lecturer, Peking University School of Law, Beijing, China, May 26 & 29, 2004

*Point-Counterpoint—When is there Insurance Coverage for Construction Defects Under Commercial Liability Policies*, Presentation with Douglas R. Richmond, HOT TOPICS IN CONSTRUCTION LAW, CONSTRUCTION LAW COMMITTEE, KCMBA, Kansas City, Missouri, November 6, 2003

*Industry-Government Partnership for Terrorism Insurance: A Risk-Based Analysis*, Presenter, SEVENTH ANNUAL ASIA PACIFIC RISK AND INSURANCE ASSOCIATION CONFERENCE, Bangkok, Thailand, July 22, 2003

*Industry-Government Partnership for Terrorism Insurance: A Risk-Based Analysis,* THIRTY-NINTH ANNUAL SEMINAR AND RESEARCH ROUNDTABLE OF THE INTERNATIONAL INSURANCE SOCIETY, INC., New York, New York, July 16, 2003

*Insurance and Compensation after September 11th: A Dialogue with the Special Master of the Victims Compensation Fund*, THE ANNUAL MEETING OF THE ASSOCIATION OF AMERICAN LAW SCHOOLS, SECTION ON INSURANCE LAW, Washington, D.C., January 5, 2003 (Moderator and Organizer)

*Exclusion of Terrorist-Related Harms From Insurance Coverage: Do the Costs Justify the Benefits*, Paper Presentation, CONFERENCE ON LAW & ECONOMIC OF PROVIDING COMPENSATION FOR HARMS CAUSED BY TERRORISM, Georgetown University Law Center, Washington, D.C., April 19, 2002

*Insurance Coverage for Losses from Terrorist Activity*, Presentation, A NEW WORLD FOR INSURANCE COVERAGE ATTORNEYS, 10TH ANNUAL INSURANCE COVERAGE LITIGATION COMMITTEE MIDYEAR PROGRAM, AMERICAN BAR ASSOCIATION TORTS AND INSURANCE PRACTICE SECTION, New Orleans, Louisiana, February 23, 2002

*Financial Services in the 21st Century: An Insurance Perspective*, Invited Presentation, THE ANNUAL MEETING OF THE ASSOCIATION OF AMERICAN LAW SCHOOLS, SECTION ON FINANCIAL INSTITUTIONS AND CONSUMER FINANCIAL SERVICES, New Orleans, Louisiana, January 5, 2002

*The Significance of State ex rel. Tracy v. Dandurand*, Invited Presentation, Kansas City Metropolitan Bar Association, Torts Committee, September 27, 2001

*Chinese Insurance Law and the WTO*, Presenter, FIFTH ANNUAL ASIA PACIFIC RISK AND INSURANCE ASSOCIATION CONFERENCE, Bangalore, India, July 16, 2001

Access to the Chinese Insurance Market, *Thirty-Seventh Annual Seminar and Research Roundtable of the International Insurance Society, Inc., Vienna, Austria, July 11, 2001*

*Law in Chinese Culture as Reflected in the Resolution of Traffic Accident Claims*, Presenter, LAW IN CHINESE CULTURE, sponsored by the Humanities Research Center, Australian National University, Canberra, Australia, December 10, 2000

### JEFFREY ELLIS THOMAS

*WTO and Chinese Insurance Law*, Invited Presentation, WTO AND CHINA: CHALLENGES AND OPPORTUNITIES, sponsored by Connecticut Insurance Law Center and the University of International Business and Economics, Beijing, China, October 16, 2000

*Legal Enforcement of Chinese Insurance Law: A Contextual Assessment and Case Study,* Presenter, FOURTH ANNUAL CONFERENCE OF THE ASIA PACIFIC RISK AND INSURANCE ASSOCIATION, Perth, Australia, July 19, 2000

*The Rule of Law: Structural and Cultural Dimensions of the American Legal System*, Invited Lecture, SINO-AMERICAN CONSTITUTION AND RULE OF LAW SYMPOSIUM, sponsored by, Sichuan University Law School, Sichuan University Foreign Languages and Culture Department, and the U.S. Consulate, Chengdu, China, April 11, 2000

*An American Law Professor in China: Comments on the Future of Rule of Law,* Invited Lecture, SEMINAR ON THE REVIEW AND PROSPECT OF THE LEGALITY CONSTRUCTION IN THE 20TH CENTURY IN CHINA, sponsored by the Chinese University of Political Science and Law, Beijing, China, April 5, 2000

*American Insurance Law: Fundamental Principles and Considerations for Chinese Law,* Fulbright Guest Lecture, Guangxi University, Nanning, China, March 21, 2000

*The American Legal System: Strengths, Weaknesses and Possible Lessons for China*, Guangxi University, Nanning, China, March 21, 2000; American Center for Educational Exchange, Beijing, China, January 6, 2000; Jinan University, Guangzhou, China, November 15, 1999; Zhongshan University, Guangzhou, November 12, 1999

*Ethical Issues in Insurance Law – An interactive discussion using hypothetical scenarios*, ETHICAL CONSIDERATIONS FOR THE DEFENSE ATTORNEY, Continuing Legal Education Seminar, Kansas City, Missouri, June 22, 1999

*A Socio-Economic Analysis of Insurance Policy Interpretation,* Paper Presentation, TULANE CONFERENCE ON SOCIO-ECONOMICS AND BINARY ECONOMICS, New Orleans, Louisiana, January 6, 1999

*Historical and Theoretical Overview: Why is Construction Defect Litigation So Complex and So Expensive?*, Invited Lecture, INSURANCE COVERAGE FOR DEFECTIVE CONSTRUCTION II, sponsored by the Tort and Insurance Practice Section, the Insurance Coverage Committee and the Property Insurance Committee of the American Bar Association, Marina del Rey, California, June 4, 1998 (by video tape)

*An Interdisciplinary Critique of the Reasonable Expectations Doctrine*, Invited Presentation, THE ANNUAL MEETING OF THE ASSOCIATION OF AMERICAN LAW SCHOOLS, INSURANCE LAW SECTION, San Francisco, California, January 7, 1998

*An Alternative to Traditional Risk Allocation - The Warranty Approach*, Invited Lecture, THE OWNER/ARCHITECT RELATIONSHIP: A MARRIAGE MADE IN HEAVEN OR . . ., 1997 Annual Mid-Year Conference of the Construction Owners Association of America, Chicago, Illinois, September 12, 1997

*The Complex Nature of Construction Litigation*, Invited Lecture, THE ANNUAL MEETING OF THE AMERICAN BAR ASSOCIATION, INSURANCE COVERAGE LITIGATION COMMITTEE OF THE TORT AND INSURANCE PRACTICE SECTION, San Francisco, California, August 3, 1997

*Report on the September, 1996 National Institute on Coverage for Defective Construction*, AMERICAN BAR ASSOCIATION TORT AND INSURANCE PRACTICE SECTION INSURANCE COVERAGE LITIGATION COMMITTEE CLE MIDWINTER MEETING, San Antonio, Texas, February 21, 1997 (with Thomas W. Johnson, Jr., Esq.)

### JEFFREY ELLIS THOMAS

*Current State of Liability Insurance Coverage Law*, ESSENTIALS OF LIABILITY INSURANCE COVERAGE, Continuing Legal Education Seminar, Kansas City, Missouri, December 13, 1996

*Project Policies (Wrap-ups), Warranty Policies, "Buy Backs",* Invited Lecture, INSURANCE COVERAGE FOR DEFECTIVE CONSTRUCTION, sponsored by the Insurance Coverage Committee of the Tort and Insurance Practice Section of the American Bar Association, San Diego, California, September 27, 1996 (with Julia Molander, Esq.)

*Dimensions of an Insurance Dispute Based on a Hypothetical Problem* and *Point and Counterpoint - Bad Faith Breach of Insurance Policy: Present and Future for Bad Faith Tort Claims*, Moderator for Panel Discussion, FUNDAMENTALS OF COMMERCIAL INSURANCE LAW, Continuing Legal Education Seminar, Kansas City, Missouri, December 1, 1995

## SELECTED CONSULTING EXPERIENCE

**Consultant, Lexis-Nexis/Matthew Bender & Co., Appleman on Insurance**

Advising on how to update 60+ volume treatise and assisting in recruitment of Board of Editors and authors

**Reviewer, Aspen Law and Business Publishing**

Reviewed draft books on Law and Economics and Insurance Law and Policy

**Consultant, Lexis-Nexis/Matthew Bender & Co., Insurance Law Classification Scheme**

Reviewed and made recommendations for classification scheme to be used in database

## PROFESSIONAL ACTIVITIES AND ASSOCIATIONS

**American Bar Association**

Tort Trial and Insurance Practice Section
    Insurance Regulation Committee (2017-continuing)
    Taskforce on Federal Involvement in Insurance Regulation Modernization (2004-2017)
    Taskforce on Student Outreach (2003-06)
    Insurance Coverage Litigation Committee, Vice Chair (2004-05, 2007-08, 2009-10)
    Appellate Advocacy Committee, Vice-Chair (1998-2003)
Legal Education and Admissions to the Bar Section

**American College of Coverage Counsel**

Honorary Fellow (2017-present)
Outreach Committee (2017-2018)

**American Law Institute**

Elected Member (2010 and continuing)
Adviser, Restatement of the Law of Liability Insurance project (2010-2018)

**Asia Pacific Risk and Insurance Association**

President (2007-08)
Vice President – Operations/Finance (2006-07)
Vice President – Program (2005-06)
Board of Governors (2002-05)
Member, Journal Preparation Committee (2002-03)

### JEFFREY ELLIS THOMAS

Member, Nomination Committee (2002-05)

**Association of American Law Schools**

Insurance Law Section, Executive Board (2004), Chair (2003), Program Chair (2002), Secretary/Treasurer (2001), Newsletter Editor & Executive Board (1995-2000)

**Kansas City Metropolitan Bar Association**, Insurance Law & Torts Committees

**Lawyers Association of Kansas City**, Executive Board (2004-2011)

**State Bar of California,** Member (inactive status)

**EXHIBIT B**

**DOCUMENTS REVIEWED**

| Description | Bates #s |
|---|---|
| Agreement to Terms of Protective Order | N/A |
| [ECF 032] Protective Order Re: Confidentiality | N/A |
| Engagement Letter | N/A |
| [ECF 004] – Complaint | N/A |
| [ECF 037] – Amended Answer to Complaint | N/A |
| Plaintiff's First Set of Requests for Admission, Interrogatories and Requests for Production to Defendant | N/A |
| Scottsdale's Objections and Responses to Plaintiff's First Set of Requests for Admission, Interrogatories and Requests for Production | N/A |
| Scottsdale's Amended Objections and Responses to Plaintiff's First Set of Requests for Admission, Interrogatories and Requests for Production | N/A |
| Reservation of Rights Letter | NBH_000108 |
| Scottsdale May 2, 2017 Denial Letter | NBH_000495 |
| Arbitration Award | NBH_00535 |
| Scottsdale 2015-2016 Insurance Policy | SCOTTSDALE_0001-0091 |

| Description | Bates #s |
|---|---|
| Redacted Claim Notes | SCOTTSDALE_0007354-007380 |
| Reinsurance Contract | SCOTTSDALE_0007381 |
| April 14, 2017 NBH Demand Letter with Exhibits | NBH_000115-000494 |
| Tolling Agreement | NBH_000517 |
| Amendment to Tolling Agreement | NBH_000526 |
| December 30, 2015 NBH Demand Letter | SCOTTSDALE_00092-94 |
| Settlement Agreement | NBH_000508 |
| Scottsdale 30(b)(6) Deposition Transcript and Deposition Exhibits 1-16 | N/A |
| Samantha Kulig Deposition Transcript and Deposition Exhibits 17-42 | N/A |
| Veronica DeVoe Deposition Transcript and Deposition Exhibits 43-50 | N/A |
| Aaron Klass Deposition Transcript and Deposition Exhibits 51-54 | N/A |
| Timothy Lucas Deposition Transcript and Deposition Exhibits 55-78 | N/A |
|  |  |

**Exhibit B**