# EXHIBIT 4 TO MOTION TO EXCLUDE EXPERT TESTIMONY OF LARRY GOANOS

Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

-----------------------------x
NBH CAPITAL FINANCE, a
division of NBH BANK, N.A.,


            Plaintiff,

        vs.                    Civil Action No.
                               1:19-CV-02153-DDD-MEH
SCOTTSDALE INDEMNITY CO., an
OHIO CORPORATION,

            Defendant.
-----------------------------x
```

Remote Videotaped Deposition of TIMOTHY LUCAS

Tuesday, August 25, 2020 – 11:06 a.m.

Reported by:

Jennifer Ocampo-Guzman, CRR, CLR

Job No.: 28268

```
 1                    Lucas
 2         break?  I'll collect my thoughts and try
 3         to move through one more series of
 4         questions, and then I'll be done; is
 5         that okay?
 6                 THE WITNESS:  What time is that?
 7                 MR. ROGOSKI:  Let's say 4:30, or
 8         3:30 your time?
 9                 THE WITNESS:  I'll be back in.
10                 THE VIDEOGRAPHER:  The time is
11         4:17 p.m.  We're going off the record.
12                 (A brief recess was taken.)
13                 THE VIDEOGRAPHER:  The time is
14         4:28 p.m.  We're going back on the
15         record.
16         Q.   Mr. Lucas, when you received the
17    letter from Scottsdale's lawyers indicating
18    that they were denying coverage and were
19    going to withdraw from the defense, did you
20    consider retaining counsel to respond to
21    Scottsdale's coverage denial?
22         A.   I did.
23         Q.   And --
24         A.   Oh, Scottsdale's, no.  I simply
25    talked with Derek about it and --
```

Page 172

1                  Lucas
2        Q.   Is there a -- I guess, is there a
3    reason you didn't?
4        A.   Resources were quite limited, and I
5    didn't want to have two fights going on at
6    the same time.
7        Q.   Did you take objection with
8    Scottsdale's coverage denial?
9        A.   After discussing it with Mr.
10   Anderson, we elected to just reply to NBH's
11   demand.
12       Q.   Okay.  And I can't ask you about
13   conversations with your attorney because of
14   the privilege.
15       A.   I did ask Mr. Anderson to inquire
16   multiple times again with the insurance
17   agency if they would reconsider.
18       Q.   And by "insurance agency," you're
19   referring to the Scottsdale and not to
20   Mesirow?
21       A.   Correct.
22       Q.   And it was your -- without asking
23   you what Mr. Anderson may have told you, and
24   of course we're here today involved in this
25   lawsuit, you understood that Scottsdale was

1                    Lucas

2     not willing to reconsider its position; is

3     that fair?

4         A.    Yes, that is fair.

5               MR. ROGOSKI:  So I am going to

6          introduce an exhibit.

7         Q.    I show you what we previously

8     marked as Exhibit 59.  Do you recognize this

9     settlement agreement, Mr. Lucas?

10        A.    Let me confirm the date.

11              I believe I do.  Yes.

12        Q.    And if you turn to page 7, is that

13    your signature?

14        A.    Yes.

15        Q.    Can you tell me how it came about

16    that you entered this settlement agreement

17    with NBH?

18        A.    We went to arbitration.  I had a

19    solid few days of testimony.  The arbitrator

20    sided with the plaintiff.  I lost my case.

21    And we had agreed prior in going into

22    arbitration that if the bank prevailed, we

23    would move forward and assist these things.

24        Q.    So when was, when was this

25    agreement entered with the -- with the bank?

1              Lucas
2       A.   I don't see a date on this one.
3       Q.   Go ahead.
4       A.   My expectation, it was in April
5    2018.
6       Q.   Well, the information at the top
7    indicates to me that it was filed in the
8    court --
9       A.   I'm sorry, this is not the
10   concluding document.  This is -- okay.  So
11   this was prior to arbitration, the reason to
12   go to arbitration rather than having a trial
13   in Colorado.  Certainly I didn't have that
14   kind of wherewithal.
15      Q.   So this document was entered in or
16   about November of 2017; is that right?
17      A.   Yes.
18      Q.   What transpired in the litigation
19   by NBH between the time in the beginning of
20   May when Scottsdale withdrew the defense and
21   this agreement was entered in November of
22   2017?
23      A.   Very little.  Some basic discovery
24   and answering questions back and forth,
25   sharing some financial statements I think was

Page 175

1                Lucas

2    in there during that time frame.  Talking to
3    counsel, having our counsel talk to the
4    bank's counsel.  And NBH counsel initiated
5    this particular discussion, I believe.  It
6    may have been my attorney who proposed it in
7    the first place, but I believe it was
8    initiated by NBH.
9         Q.   Do you know whether the document
10   we've marked was prepared by NBH's counsel or
11   your counsel?
12        A.   I do not.
13             I do know my counsel was involved,
14   at least in review.
15        Q.   Right.  But you don't know what the
16   back and forth was between your counsel and
17   NBH's counsel over the terms of this
18   agreement?
19        A.   I do not.
20        Q.   If you turn to page 2, under
21   paragraph 2, "Settlement Payment," it
22   provides that within five days of entry of
23   the arbitration award for damages, if any,
24   entered by the arbitrator against defendants,
25   the settlement payment shall be made; and the

1                    Lucas

2      "Whereas" clause, paragraph G, reflects that

3      the settlement payment is in the sum of

4      $10,000.

5                Do you see those provisions?

6          A.   I do.

7          Q.   Is it your understanding that you

8      and Mr. Sussman together were responsible for

9      the sum of $10,000, or were each of you

10     responsible for the sum of $10,000?

11         A.   Together; but if one couldn't pay,

12     the other would pay it all.

13         Q.   Okay.

14              I think you indicated and we know

15     the result of the arbitration was a decision

16     averse to you and Mr. Sussman, correct?

17         A.   Correct.

18         Q.   And did you and Mr. Sussman make

19     the payment of $10,000 required by this

20     agreement?

21         A.   I made the payments, and Mr.

22     Sussman paid me back over time for his

23     $5,000.

24         Q.   If you would turn to the next page,

25     under paragraph 5, "Assignment"?

1                  Lucas

2        A.   Yes.

3        Q.   This paragraph provides that you

4   and Mr. Sussman will assign any claim you may

5   have against any insurance company, including

6   Scottsdale, to NBH for collection of the

7   arbitration award; is that correct?

8        A.   That's correct.

9        Q.   And it further provides that

10  defendants shall retain their right in any

11  claim against Scottsdale for any legal

12  expenses and costs, do you see that

13  provision?

14       A.   I do see that.

15       Q.   And is that a provision that your

16  counsel had included in this agreement?

17       A.   I asked for it.

18       Q.   And NBH agreed?

19       A.   Yes.

20       Q.   So any claim against Scottsdale for

21  breach of the duty to defend belongs to you;

22  is that correct?

23       A.   To recover legal expenses.

24       Q.   Right.  And Scottsdale's obligation

25  to pay legal expenses under the policy is

Page 178

1                    Lucas

2      pursuant to the duty to defend, right?

3           A.   Yes.

4           Q.   How much in legal expenses did you

5      incur in connection with the lawsuit, after

6      Scottsdale withdrew the defense in the

7      subsequent arbitration?

8           A.   A little over $200,000.

9           Q.   And you paid that?

10          A.   I paid all of it.

11          Q.   Mr. Anderson's firm, Winget

12     Spadafora?

13          A.   Yes.  But in that number I'm also

14     including what we paid the arbiter, what I

15     paid our expert witness, which, you know, was

16     not very much, but combined it was just over

17     $200,000.

18          Q.   And did Mr. Sussman pay you back

19     for any portion of that?

20          A.   The only portion he paid was the

21     $5,000, his half of the $10,000 award.

22          Q.   Have you considered initiating

23     action against Scottsdale to recover that

24     $200,000?

25          A.   I have not.

```
 1                     Lucas
 2         Q.   Is there a reason why you haven't?
 3         A.   It is my hope to move forward in my
 4   life and not look backwards.
 5         Q.   And just to -- I might have asked
 6   you this, but I can't remember as I sit here
 7   right now; but you paid over $200,000 to
 8   Winget Spadafora, arbitration fees and the
 9   experts -- and the expert?
10         A.   Yes.
11         Q.   Okay.
12              So the -- you appeared and
13   testified at the arbitration hearing; is that
14   right?
15         A.   I did.
16         Q.   Did Mr. Sussman also appear?
17         A.   He did.
18         Q.   How many days was the hearing?
19         A.   I believe we were there, it was
20   scheduled for a week, I think we took
21   three days of that period of time.
22         Q.   Do you recall how long it was after
23   conclusion of the hearing that the arbitrator
24   ruled?
25         A.   It -- I believe, so the hearing was
```

Page 230

1                       Lucas
2      ongoing, okay, that group is not going to be
3      here.  We don't need five computer people,
4      for example.
5                And not that it was, if there were
6      adjusting items, then we would have to look
7      at the pro forma build-out statement that
8      J.T. did to see what came in and out, and he
9      was much more involved in that than I was.
10     But the numbers all looked reasonable based
11     on histories and cash flows and real cash in
12     the bank and that sort of thing.
13          Q.   So they send the policy limits
14     demand April 14th.  You've responded kind of
15     your points here and why you think it should
16     be vigorously defended, correct?
17          A.   Yes.
18          Q.   And then a couple weeks after this,
19     Scottsdale issues its denial.
20          A.   Yes.
21          Q.   Now, if we could look at Exhibit 9.
22     Let me know if you're able to call that up.
23          A.   Yes, it's coming up now.  Okay.
24          Q.   And you reviewed this denial at the
25     time, in May 2017?

Page 231

1              Lucas
2         A.   Yes.
3         Q.   In your opinion, does this denial
4    consider the points that you made in response
5    to NBH's demand?
6         A.   I don't recall addressing those.  I
7    recall addressing their view of why they
8    didn't have an obligation here.
9         Q.   And you testified that in your
10   opinion the NBH demand included allegations
11   against you that you don't think were
12   accurate, correct?
13        A.   Yes.
14        Q.   Do you recall if -- looking at
15   Exhibit 9, is it your position that
16   Scottsdale relied on NBH's allegations rather
17   than your points?
18        A.   Honestly, I -- I remember reading
19   the denial and sending those to the attorney
20   and not looking as much as their argument
21   other than the clear statement that they
22   didn't want to help.  And trying to problem
23   solve, okay, what do I do now?  How long
24   would it take to try to fight and force these
25   guys to support me with money that, again,

Page 232

1                    Lucas
2      was pretty limited, versus just trying to
3      defend or ultimately maybe even settle myself
4      with some fee that I could afford.
5              Clearly, you know, when you're
6      being presented a $5 million claim and you
7      have $50,000 in the bank, you are going to
8      look, you want me to be bankrupt if your goal
9      is to make me bankrupt, then you can do that.
10     So I thought at the time I could take that
11     $50,000 and make some defense and then
12     ultimately get to a point where we can
13     discuss, guys, I can't even defend myself
14     anymore, what is the purpose of this?  But it
15     didn't get to that point – --
16        Q.   Although I guess here there is a
17     settlement agreement you were able to protect
18     yourself in some way; is that correct?
19        A.   -- Yes, and I don't know if it was
20     my attorney who reached out or the
21     plaintiff's side that reached with would you
22     be willing for a proposal, but, you know, I
23     continued to spend money to defend, but at
24     least I made sure I didn't have a $5 million
25     number on my head that I would have to pay